**HUBBARD BROADCASTING, INC., Plaintiff,**

**v.**

**SOUTHERN SATELLITE SYSTEMS, INC. and Turner Broadcasting System, Inc., Defendants.**

**No. 3–81 Civ. 330.**

United States District Court, D. Minnesota, Third Division.

Aug. 23, 1984.

Leonard, Street & Deinard by Sidney Barrows, Byron Starns, and Patricia Schaffer, Minneapolis, Minn., for plaintiff.

Faegre & Benson by Duane Krohnke, Minneapolis, Minn., Pepper & Corazzini by Robert Corazzine, Washington, D.C., and Jerry Reed, Tulsa, Okl., for defendant Southern Satellite Systems, Inc.

Popham, Haik, Schnobrich, Kaufman & Doty, Ltd. by Thomas K. Berg, Minneapolis, Minn., Troutman, Sanders, Lockerman & Ashmore by Tench C. Coxe and Hugh M. Davenport, Atlanta, Ga., for defendant Turner Broadcasting System, Inc.

## MEMORANDUM ORDER

ALSOP, District Judge.

This matter comes before the court upon cross-motions for summary judgment. All parties agree that there are no genuine issues of material fact in dispute and that the question whether or not defendants are liable to plaintiff for copyright infringement is purely a question of law. The parties have submitted a joint stipulation of facts I and II, joint exhibits, volumes of separate exhibits, affidavits, a compendium of legal authorities, individual statements of facts and a number of briefs. The issues have been well presented by able counsel on all sides.

### I. *Standing*

■ Plaintiff claims standing under 17 U.S.C. § 501(b), which provides that "the legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed while he or she is the owner of it." Hubbard claims it has standing if (1) it is the owner of an exclusive right and (2) Turner & Southern infringed the particular right that Hubbard owns. Hubbard says the first requirement is met because all of the licenses for the five works in issue contain two provisions, a granting provision and an exclusivity provision, which together convey to Hubbard the exclusive right to transmit the works to television (TV) viewers in Hubbard's broadcast areas. "Plaintiff's Reply Memo" at 3–10. Hubbard claims the second requirement is met because Hubbard's exclusive right to exhibit the works to the television viewing audience in particular territories is the precise right allegedly infringed by Turner/Southern's cable transmissions of the works within Hubbard's exclusive zone. *Id.* at 11–16.

· Defendants contend plaintiff lacks standing because, first, it is not the owner of any exclusive rights. Defendants claim the licenses do not affirmatively grant Hubbard a portion of the owner's exclusive rights, but instead merely contain promises by the owners that they will not license certain conduct by other entities. Those promises may give Hubbard a breach of contract claim, but do not constitute the transfer of part of the copyright owners' exclusive rights. "Defendants' Joint Memo" at 61–63. Furthermore, any exclusivity rights stemming from Hubbard's form exclusivity rider were directly dependent upon the FCC's syndicated program exclusivity rules. Once the FCC repealed those rules, after execution of these license agreements, Hubbard's exclusivity rights terminated. Second, defendants say, their activities have not interfered with Hub-

bard's copyright interests because the transmissions were not broadcast to TV viewers but occurred on a nationwide basis to cable TV systems. *Id.* at 63.

The court finds that plaintiff is the owner of exclusive rights in the five works and that plaintiff alleges that defendants' acts infringed the particular rights plaintiff owns. The court finds it is not necessary to repeat the parties' analysis except to note that it agrees that the granting and exclusivity provisions construed together give plaintiff exclusive rights to the works in particular geographic areas and that while repeal of the FCC syndicated programming exclusivity rules may have removed one basis of exclusivity, passage of the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, gave plaintiff another basis. Contrary to defendants' assertions, it seems very clear that the acts complained of allegedly infringed the particular rights plaintiff owns—plaintiff claims the exclusive right to televise particular works in particular geographic areas and defendants allegedly showed the same works in the same areas. The court basically agrees with plaintiff's assessment of its 501(b) standing found in its reply brief, at 1–16.

The plaintiff also claims standing under 17 U.S.C. § 501(c) and defendants challenge that standing as well. Plaintiff concedes, however, that § 501(c) standing is superfluous because it already has § 501(b) standing. The court agrees that it is unnecessary to decide the scope of § 501(c) standing since the court has found plaintiff has standing under § 501(b).

## II. *Prima Facie Copyright Liability*

■ Plaintiff must establish five elements to make a prima facie showing of copyright infringement. Those elements are:

1. The originality and authorship of the compositions involved;

2. Compliance with all formalities required to secure a copyright under 17 U.S.C. § 101 *et seq.*;

3. That plaintiff is the proprietor of the copyrights of the compositions involved;

4. That the compositions were publicly performed for profit; and

5. That the defendants have not received permission from plaintiff or its representatives for such performance.

*George Simon, Inc. v. Spatz,* 492 F.Supp. 836, 838 (W.D.Wisc.1980). The first three elements are not in dispute and are covered by Joint Stipulation II of the parties. In response to the fifth element, defendants in effect say that they do not need plaintiff's permission because of various exemptions and licensing systems established by 17 U.S.C. § 111. Those sections will be discussed in parts IIIC and IIID, *infra.* In response to the fourth element, defendants say that the works were not publicly performed. Plaintiff contends that the works were publicly performed by both Turner and Southern.

■ Section 101 of the Copyright Act says:

> To perform or display a work "publicly" means—
>
> .　　.　　.　　.　　.
>
> to transmit or otherwise communicate a performance or display of the work ... to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

To "perform" a work "means ... in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible." *Id.* To "transmit" a performance or display is "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." *Id.* Plaintiff claims that Congress intended these definitions to be construed broadly and points to House Report 63, U.S.Code Cong. & Admin.News 1976, pp. 5659, 5676 which says, "The concepts of public performance and

public display cover not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public." Congress intended to cover all transmission activity in its broad definition of transmit. The House Report explains that "any device or process" is "broad enough to include all conceivable forms and combinations of wired or wireless communications media, including but by no means limited to radio and television broadcasting as we know them." *Id.* at 64, U.S.Code Cong. & Admin.News 1976, p. 5678. That report also states that:

Each and every method by which images or sounds comprising a performance or display are picked up and conveyed is a "transmission," and if the transmission reaches the public in any form, the case comes with the scope of clauses (4) or (5) of Section 106.

*Id.* at 64, U.S.Code Cong. & Admin.News 1976, p. 5678. [Section 106 defines exclusive rights and says the copyright owner has the exclusive right to do and to authorize, among other things, public performance of the work (clause 4) and public display of the work (clause 5).]

It is thus clear, plaintiff says, that the Act was intended to cover indirect as well as direct transmissions to the public. Even a performance to a selected group is still a public performance, plaintiff says, citing authority at "Plaintiff's Memo" at 11–12. Turner originates performance of the works and Southern's retransmission is independently a public performance. Plaintiff notes that § 111(a), which exempts certain retransmission activity from copyright liability, would be unnecessary if retransmission activity were not a public performance.

Plaintiff relies on *WGN Continental Broadcasting Co. v. United Video, Inc.,* 693 F.2d 622, 625 (7th Cir.1982). WGN, like Turner's station WTBS, is a "superstation," *i.e.,* its programs are carried outside its local broadcast area by cable TV systems. Its signals were transmitted by an intermediate carrier, United Video, to the cable systems. The court noted that United Video could not be immune from copyright liability just because it did not retransmit WGN's signal directly to the public, that is to the cable subscriber, but instead transmitted the signal to the cable systems who retransmitted it to their subscribers. The court said:

The passive carrier exemption [§ 111(a)(3) ] would be superfluous if intermediate carriers such as United Video could never be infringers anyway because they did not transmit directly to the public. And the scheme in section 111 [§ 111(c) ] for compensating copyright owners would be disrupted.... United Video could mutilate to its heart's content the broadcast signal it picked up and the copyright owner would have no recourse against it. His only recourse would be against the cable systems ... that were retransmitting the mutilated signals: a thousand or more copyright infringement suits instead of one.

... *[T]he Copyright Act defines "perform or display ... publicly" broadly enough to encompass indirect transmission* to the ultimate public ....

*Id.* at 625 (emphasis added). Thus, plaintiff says, both Turner and Southern publicly performed the works. Since there is no doubt the activities were engaged in for profit, plaintiff claims it has established the fourth element of its prima facie case.

Defendants contend that the works were not publicly performed because Southern's transmissions were not "to the public." "Defendants Joint Memo, Appendix B" at 2. Defendants argue that the cable subscribers, not the cable systems, constitute the public. In support they cite legislative history that predates the 1976 Copyright Act and cite the district court opinion in *WGN.* They concede that opinion was reversed by the circuit court, but disagree with the circuit court's reasoning. "Joint Memo, Appendix B" at 3–11.

The court has considered defendants' arguments and finds them unpersuasive. The legislative history, as plaintiff notes, must be addressed to the enacted definition

and exemption, not to one of the many varying versions that were discussed during the eleven years it took Congress to pass the 1976 Copyright Act. *See* "Plaintiff's Reply Memo" at 26 and 27. Similarly, defendants' reliance on the overruled *WGN* district court opinion is misplaced. This court agrees with the Seventh Circuit's analysis that a construction of public performance as including only direct performances to the public and excluding indirect transmissions would render the passive carrier exemption of § 111(a)(3) superfluous and would wreck havoc with the compulsory licensing system of § 111(c). *See* "Plaintiff's Reply Memo" at 25. The court agrees that under the broad definitions found in § 101 of the Act, a transmission is a public performance whether made directly or indirectly to the public and whether the transmitter originates, concludes or simply carries the signal. There is simply no practical basis for excluding certain transmitters from copyright liability based solely on their position in the distribution chain. The court finds that the works were publicly performed for profit by both Turner and Southern and that plaintiff has met its burden of proving the fourth element of a prima facie case.

### III. *Section III*

Defendants agree that they did not seek or receive permission from plaintiff before they showed the works at issue. They argue, however, that they did not need such permission and raise several subparts of § 111 as, in effect, justifying their actions.

#### A. *Purposes of § 111*

Prior to the Copyright Act of 1976, copyright law did not restrict the retransmission by carriers or cable systems of copyrighted works embodied in the programming of distant or local broadcast stations. The Supreme Court had ruled that mere retransmission did not constitute a new "performance" of the work. Therefore, carriers and cable companies could not be liable for infringement. *Teleprompter*

*Corp. v. Columbia Broadcasting System,* 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974); *Fortnightly Corp. v. United Artists Television, Inc.,* 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). Treatment of the burgeoning cable TV industry under copyright law proved controversial and delayed passage of the 1976 Act for eleven years. Eventually a compromise was reached and enacted as § 111 of the Act. H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 47–49, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5659, 5660–62.

In the 1976 Act, Congress redefined the term performance to include such secondary transmissions, creating potential copyright liability for cable systems and carriers involved in such retransmissions. At the same time, however, Congress provided complete exemption for certain secondary transmissions, such as those by a passive carrier under § 111(a)(3), and created a compulsory licensing system in § 111(c) allowing cable TV systems to retransmit the copyrighted programming of distant broadcast stations in return for certain royalty payments.

The compromise was intended to implement two divergent national policies. On the one hand, Congress wished to expand the public's access to diverse programming by encouraging development of the cable TV industry. *See, e.g., Capital Cities Cable Inc. v. Crisp,* —— U.S. ——, 104 S.Ct. 2694, 2703, 2706, 81 L.Ed.2d 580 (1984); *Sony Corp. of America v. Universal City Studios, Inc.,* —— U.S. ——, 104 S.Ct. 774, 775, 78 L.Ed.2d 574 (1984).

On the other hand, Congress clearly sought to protect local broadcasters and to further the purpose in the Copyright Clause, U.S. Const., Art. I, § 8, of rewarding the creators of copyrighted works. The whole rationale for the compulsory licensing system of § 111(c) and the royalty schedules of § 111(d) is that the market mechanism that compensates copyright owners through the sale of advertising by local independent broadcasters is disrupted by the free importation of these signals into distant areas.

The market does not, however, as naturally compensate the owners of syndicated programming initially broadcast in communities remote from the cable system. Such programming is generally sponsored by local advertisers with little or no interest in the distant cable audience.

Consequently, the Copyright Act requires cable operators to pay royalties as a function of the "distant signal equivalents" (DSEs) they carry.

*National Cable Television Assoc. v. Copyright Royalty Tribunal*, 689 F.2d 1077, 1079–80 (D.C.Cir.1982) (footnotes omitted).

The Supreme Court recently reaffirmed the dual goals of § 111 when it said: "Compulsory licensing not only protects the commercial value of copyrighted works but also enhances the ability of cable systems to retransmit such programs carried on distant broadcast signals, thereby allowing the public to benefit by the wider dissemination of works carried on television broadcast signals." *Capital Cities Cable, Inc.*, 104 S.Ct. at 2706. With these purposes of § 111 in mind, the court now turns to the specific subsections the parties invoke and considers their application to the facts of this case.

### B. *Section 111(b)*

Before considering whether or not Southern qualifies for the passive carrier exemption of § 111(a)(3) and whether or not its customers qualify for the compulsory licensing system of § 111(c), the court will consider whether or not the transmissions involved here fall within 17 U.S.C. § 111(b). Plaintiff claims that the secondary transmissions that occurred here are actionable as acts of infringement under § 111(b); secondary transmissions that fall within § 111(b), plaintiff says, are precluded from qualifying for the exemptions of § 111(a) or (c).

■ Section 111(b) provides that certain secondary transmissions are actionable based upon the nature of the primary transmission. If the primary transmission is not made for reception by the public at large but is controlled and limited to reception by particular members of the public, then the secondary transmission to the public of the primary transmission embodying a performance or display of a work is actionable. Plaintiff contends that the Turner/Southern cable transmission comes within this express language because of defendant Turner's practice of commercial substitution.

The parties have explained in great detail the technical process by which WTBS, Turner's Atlanta television station, transmits both a UHF or "off-the-air" signal and a microwave signal. They have also explained how Southern receives by direct microfeed link the microwave signal and how Southern's Lenco Video Detector is programmed to receive the microwave signal unless that signal is interrupted, in which case Southern picks up the over the air signal. *See, e.g.*, Affidavit of Gary W. Stanton; Affidavit of Jack D. Verner, Sr.; "Hubbard's Statement of Facts" V. At WTBS's studios, the UHF and the direct interconnection video switches select identical and simultaneous signals when embodying what the lay person would term a "program," for example, a segment of the TV show "I Dream of Jeannie" or a segment of a movie like "The Man Who Wouldn't Talk." Upon completion of such a segment, however, technicians operating the switches can select different commercial or other nonprogramming material. The UHF signal, for example, may carry a commercial for a local Atlanta supermarket. The microwave signal, however, could carry an advertisement of more national interest to the nationwide cable audience of Southern's cable company customers. Plaintiff terms this practice commercial substitution and contends that these changes may result in a variance of 40% in the nonprogramming content of the two signals. This altered microwave transmission is, plaintiff says, a specialized cablecasted or pay-cable-type signal governed by § 111(b) as a "primary transmission ... not made for reception by the public at large but ... controlled and limited to re-

ception by particular members of the public." 17 U.S.C. § 111(b).

Defendants contend that § 111(b) has no application to this case. Congress' purpose in enacting that section was to protect against unauthorized retransmissions of transmissions *not* intended for the general public, for example, of MUZAK. Turner's transmissions, defendants say, were intended for the general public. The focus of the Copyright Act is upon protection of rights in particular works, defendants explain, and not upon "signals" or technological means of signal delivery. Hubbard has no copyright interest in any of the commercial material broadcast by Turner and the signal sent to Southern embodying the five works that Hubbard bases its claims on was identical to, simultaneous with and originated from the same source as the signal embodying those works broadcast over the air. Commercial substitution does not create a separate primary transmission. In retransmitting the works, Southern was retransmitting programs broadcast to the general public by WIBS. *See* "Defendants' Joint Memo" at 48–52. Thus, defendants say, § 111(b) does not apply.

Plaintiff argues that the term transmission refers to the overall output of a transmitter and includes programs, commercials, station breaks and other non-programming material. Section 111(b) does not, plaintiff says, apply on a work-for-work basis. Plaintiff relies on the definitions in § 101, the prohibition on alteration of commercials by cable systems under the compulsory licensing scheme of § 111(c)(3) and various language in §§ 111(d)–(4) and 111(f). *See* "Plaintiff's Reply Memo" at 38–43. In plaintiff's view, commercial substitution results in the creation of two transmissions, one of which falls within § 111(b).

The Copyright Act of 1976 unfortunately does not define the word transmission. Section 111(f) defines a primary transmission as "a transmission made to the public by the transmitting facility whose signals are being received and further transmitted by the secondary transmission service, regardless of where or when the perform-

ance or display was first transmitted." Section 101 says "To 'transmit' a *performance or display* is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." (Emphasis added.) Performance and display are not defined, but the act ties their meaning to a work nonetheless. Section 101 says "To 'display' a *work* means ..."; "To 'perform' a *work* means ..." (emphasis added). Finally, § 111(b) itself makes actionable the secondary transmission of "a primary transmission *embodying a performance or display of a work....*" (Emphasis added.)

The language of those sections seems to indicate that § 111(b) was intended to apply on a work-for-work basis. Viewed in that light, transmission of the five works to Southern was identical to the signal embodying those works broadcast over the air.

Even if "primary transmission" is read broadly to include commercials, station breaks and other nonprogramming material, it is not clear that the practice of commercial substitution results in the creation of two separate primary transmissions. Southern only receives *and* further transmits one signal, either the microwave or UHF signal. The practice of commercial substitution does not convert the entire primary transmission into one "not made for reception by the public at large but ... controlled and limited to reception by particular members of the public" as required by § 111(b). Assuming plaintiff's figures are accurate, 100% of the programming content and 60% of the nonprogramming content of the two signals are identical. Of course, if none of WTBS's primary transmissions sent to Southern were identical to the over-the-air signal, in other words if WTBS created two entirely different signals with one for the public over the air and with another for Southern, then the court would be presented with a very different question. In the circumstances of this case, however, the court cannot say that the practice of commercial substitution requires application of § 111(b).

Plaintiff claims that it is not trying to impose § 111(c)(3)'s prohibition on commercial substitution by cable systems on Turner, the primary transmitter. *See* "Plaintiff's Reply Memo" at 42, n. 26. In effect, though, that is exactly what plaintiff seeks: plaintiff's argument is that any commercial substitution or any change in the "overall output of a transmission" results in application of § 111(b) because the primary transmission is no longer made for reception by the public at large. Application of § 111(b), plaintiff agrees, affects eligibility for the compulsory license of § 111(c) by the cable systems and eligibility for the passive carrier exemption of § 111(a)(3) by the carrier. "Plaintiff's Reply Memo" at 43. The court is not persuaded that Congress, if it had considered commercial substitution, would have intended such drastic consequences to flow from application of its admittedly unartful language in § 111(b). The court finds that § 111(b) does not apply to the transmissions involved in this case.

### C. *Section 111(a) The Carrier Exemption*

Defendants contend they are entitled to summary judgment because Southern qualifies for the exemption of § 111(a)(3). That section provides that the secondary transmission of a primary transmission embodying a performance or display of a work is not an infringement of copyright if:

> [T]he secondary transmission is made by any carrier who has no direct or indirect control over the content or selection of the primary transmission or over the particular recipients of the secondary transmission, and whose activities with respect to the secondary transmission consist solely of providing wires, cables, or other communications channels for the use of others . . . .

Defendants note that the distribution of the programming of distant broadcast stations, which lies at the heart of the compulsory licensing system, depends upon the activities of carriers, whether satellite resale common carriers like Southern or terrestrial microwave carriers. Without such carriers, cable systems could obtain only the programming of broadcast stations that could be received off the air, effectively eliminating carriage of distant stations. Eligibility of the carrier for the § 111(a)(3) exemption is thus important to the functioning of the compulsory licensing system.

Plaintiff agrees that § 111(a)(3) reflects Congress' concern that a truly passive carrier that merely supplies technical facilities for use of its customers be exempt from copyright liability. At the same time, plaintiff says that Congress was also concerned that such an exemption not be misused to provide a loophole for commercial transmitters to the public. The exemption was carefully drawn and not meant to be construed expansively.

Section 111(a)(3) identifies five elements of an exempt transmission: (1) the transmission must be made by a carrier; (2) the transmission must be a secondary transmission of a primary transmission embodying a performance or display of a work [from § 111(a)]; (3) the carrier cannot have direct or indirect control over the content or selection of the primary transmission; (4) nor over the particular recipients of the secondary transmission; and (5) the carrier's activities with respect to the secondary transmission must consist solely of providing wires, cables or other communications channels for the use of others. Defendants contend that Southern meets all of these requirements. Plaintiff contends Southern does not.

The court is aware that this case requires interpretation of a statute enacted before development of the communications arrangements involved. As another court faced with a similar situation said:

> This case . . . has its genesis in the burgeoning technological advances of the communications industry . . . .
>
> Confronted with the need to divine and apply the intent of Congress, and with a statute enacted in the technological milieu of an earlier time, we "look to the 'common sense' of the statute . . . , to its purpose, [and] to the practical conse-

quences of the suggested interpretations ... for what light each inquiry might shed."

*Eastern Microwave, Inc. v. Doubleday Sports, Inc.,* 691 F.2d 125, 127 (2d Cir. 1982), *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1232, 75 L.Ed.2d 467 (1983). The Supreme Court has advocated a cautious approach in dealing with new technologies under the copyright laws. That Court has said:

The judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring them.... Sound policy, as well as history supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials....

In a case like this, in which Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests....

*Sony Corporation of America v. Universal City Studios, Inc.,* — U.S. —, —, 104 S.Ct. 774, 783, 78 L.Ed.2d 574 (1984).

Defendants say the first element is met because Southern is a carrier. Southern has been licensed by the FCC as a resale common carrier. *In re Application of Southern Satellite Systems, Inc.,* 62 F.C.C.2d 153 (1976). The Second Circuit in *Eastern Microwave, Inc. v. Doubleday Sports, Inc.,* 691 F.2d 125, at 129 n. 10, (1982), *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1232, 75 L.Ed.2d 467 (1983), found that EMI, licensed pursuant to the same authority as Southern, 47 U.S.C. § 214, was a carrier for purposes of § 111(a)(3). Furthermore, Congress in the 1976 Act intended to expand the coverage of the exemption beyond the traditional common carrier concept, rather than limit it as plaintiff suggests. While the exemption was originally for "common carriers," it was later expanded to cover new types of carriers such as "a common, contract or special carrier" and finally broadened in the 1976 Act to "any carrier," evidencing Congress' intent not to limit the class to a particular type of carri-

er. *See* "Defendants' Joint Memo" at 21–22, n. 7 and authority cited therein.

Plaintiff argues that Southern is not a carrier as that term was used in § 111(a)(3). Passivity is the sine qua non for the exemption, plaintiff says. The term carrier had an accepted meaning when the 1976 Act was passed and that meaning was limited to traditional common carriers like the phone company. Such passive carriers generally provided facilities for customers who chose the intelligence to be transmitted over the channel. Southern, in contrast, reversed this accepted meaning of the term by itself selecting the signal to transmit to the customer who became a passive recipient. Congress' use of the term carrier in § 111(a)(3) was not intended to include the radically new meaning given it by the FCC when it licensed Southern and others as resale common "carriers" after the Act was passed, plaintiff claims.

■ The court finds that Southern is a carrier for purposes of § 111(a)(3). Congress clearly intended that term to be construed broadly when it said *"any* carrier." While the status of Southern as a resale common carrier with the FCC is not dispositive and while the court is mindful that communications policy and copyright policy may diverge, nonetheless the court finds that Southern's FCC licensing status is entitled to some weight. The court is not persuaded that Congress intended to restrict the exemption to traditional carriers or even to new types of carriers only if they exhibited the total passivity historically associated with traditional carriers. A similar argument was made and rejected in *Eastern Microwave,* 691 F.2d at 129, n. 10 where the Second Circuit said, "Though Doubleday insists on comparing EMI with the telephone company, the statute speaks in terms of 'any carrier' ... and EMI is licensed by the FCC as a common carrier ...." The court concludes that Southern is a carrier for purposes of § 111(a)(3).

■ Section 111(a)'s carrier exemption requires in addition to carrier status that the transmission be a secondary transmission of a primary transmission embodying

a performance or display of a work. Defendants contend that this requirement is met. *See* "Defendants' Joint Memo" at 22–38. Many of these arguments have already been discussed in part IIIB *supra.* Essentially, defendants argue that the retransmissions were secondary transmissions of primary transmissions of the works and that the direct microwave feed is a technological improvement that improves signal quality but does not alter the nature of the retransmissions. "Defendants' Joint Memo" at 23 and 24. The process of commercial substitution, discussed in part IIIB, *supra,* does not alter the nature of the retransmissions. *See* "Defendants' Joint Memo" at 25–27. Nowhere, defendants say, is there a requirement that a secondary transmitter must pick up the primary transmission "off-the-air." FCC rules and regulations permit the direct interconnection and Southern is not the first or only intermediate carrier to interconnect with the studios of the TV stations whose signal it delivers. *Id.* at 30, n. 10.

Plaintiff contends that Southern's retransmission may not constitute the "secondary transmission of a primary transmission" for the same reasons it advanced regarding § 111(b). *See* "Plaintiff's Reply Brief" at 34–35 and "Plaintiff's Letter Brief" at 3. Plaintiff appeared to concede at oral argument that, if defendants sent identical transmissions either over the air or by direct microfeed or both, plaintiff would have no complaint. Thus, the heart of plaintiff's complaint is the commercial substitution practice.

For the reasons discussed in part IIIB *supra* regarding § 111(b), the court finds that defendant Southern's retransmissions are the "secondary transmission of a primary transmission embodying a performance or display of a work" for purposes of § 111(a)(3).

The third requirement of § 111(a)(3) is that the carrier have no direct or indirect control over the content or selection of the primary transmission. This requirement has two aspects: control over content and control over selection. Defendants argue that Southern exercises no control over the content of the transmissions. The direct interconnection does not result in control— Southern simply retransmits without alteration the signal it receives from WTBS. WTBS alone determines the contents of that signal. Hubbard's allegation that Southern contacted personnel at WTBS with programming ideas and put people with programming ideas in touch with personnel at WTBS does not amount to control over programming. The Second Circuit in *Eastern Microwave,* 691 F.2d at 130, found that this requirement means that "a carrier-retransmitter must avoid content control by retransmitting exactly what and all of what it receives, as EMI does here." Defendants argue that Southern, just like EMI, meets that test.

Defendants also say that Southern exercises no control over selection of the transmission. Southern's decision to act as a carrier for WTBS's transmissions does not constitute such control. At the time of its application to the FCC for certification as a communications carrier, Southern had to select the broadcast station whose signal it would retransmit. The FCC's initial authorization limited Southern to distributing WTBS's signal, although the restriction has been lifted. Technologically, RCA had only a limited number of satellite transponders available and the cost of leasing additional transponders was prohibitive. The defendant in *Eastern Microwave* asserted that plaintiff EMI's decision to retransmit WOR–TV amounted to selection of the primary transmission, disqualifying it for the carrier exemption. Noting that only one satellite transponder was available to EMI, the court reasoned:

> Technical restrictions which forced EMI to make an initial one-time determination to retransmit the signals of a particular station, whatever the content of those signals, do not evidence the "control over the content and selection of the primary transmission" intended to be precluded under Section 111(a)(3). In the ordinary common carrier context, the carrier must render its service to all com-

ers, denying it to none on the basis of content, and must not select or choose among those who seek to use its service, on any basis other than a legitimate business reason. When the communication service is technologically limited to one sender, however, a type of "selection" is impelled. That type of forced "selection" cannot be the type precluded by the statute in the context here presented, for to so hold would be to require that exemption be denied to any carrier that did not retransmit every television broadcast of every television station in the country. *Id.* at 130. Defendants say that Southern is no different from EMI and that the reasoning of the Second Circuit applies with equal force to the circumstances of this case.

Plaintiff contends that Southern exercised control over both the content and selection of the primary transmission. Southern staff have suggested programming ideas to Turner's programming specialists and have played an active role in televising away-from-home sports events. Southern actively participates in the commercial substitution that affects 40% of the nonprogramming content, thus exerting control over content. In addition, plaintiff argues that Southern "selected" the primary transmission to transmit, just as the cable companies select the broadcaster(s) to whom their antennas will be tuned. That selection disqualifies cable companies from the exemption and should disqualify Southern as well. Defendants' interpretation that the technologically mandated choice of stations to be retransmitted does not constitute selection would read the word "selection" out of the Act. All cable systems carrying TV signals rather than their own programming would qualify for the § 111(a) exemption and the § 111(c) compulsory licensing system would not be used. Furthermore, plaintiff says, Southern selects the primary transmission by programming its Lenco video presence detector switch to select the microwave transmission over the UHF transmission. If the two signals were identical, Southern might be able to argue that no selection takes place, but because the transmissions differ due to commercial substitution, plaintiff maintains that Southern clearly selects the primary transmission to retransmit.

The court finds that Southern did not exercise direct or indirect control over the content or selection of the primary transmission. There is no evidence that Southern exercised control over the content of the primary transmission, other than via the commercial substitution practice, discussed *infra*. Southern also did not exercise control over the selection of the primary transmission. The court agrees with the Second Circuit in *Eastern Microwave* that the technologically mandated initial choice of the broadcaster's signal to retransmit does not constitute "selection" for purposes of § 111(a)(3). Except for the practice of commercial substitution, Southern is indistinguishable from EMI. This interpretation of "selection" does not result in all cable companies qualifying for the exemption, as plaintiff fears, because those companies would still have to meet the other requirements of § 111(a)(3).

■ The practice of commercial substitution also does not result in Southern exercising control over content or selection. WTBS, not Southern, changes the content of commercial and other nonprogramming material on the direct microfeed signal. Southern retransmits without alteration the signal it receives from WTBS. Southern always retransmits the signal received by direct interconnection and only when that signal is interrupted by WTBS or fails does Southern retransmit the off-the-air signal. *See* "Affidavit of Gary W. Stanton" at 4. Plaintiff's counsel at oral argument agreed that WTBS owns and operates the switch that can interrupt and stop the transmission of the microwave signal, causing the Lenco video presence detector to choose the UHF signal. *See* "Hubbard's Statement of Facts" and authority cited therein at 27. In fact, during broadcast of the Atlanta Braves games, Turner activates a switch at WTBS during the play-by-play that causes the video detector to

switch to the UHF signal. At the commercial breaks, Turner switches the switch back to reestablish the microwave signal containing national commercials. This procedure demonstrates that Turner, not Southern, exercises the control over the selection of primary transmission.

■ The fourth requirement of § 111(a)(3) is that the carrier exercise no direct or indirect control over the particular recipients of the secondary transmission. Defendants contend that Southern exercises no more control over the recipients of its transmissions than did EMI. The recipients are cable systems that comply with the provisions of Southern's FCC tariff, sign a written contract to receive the service, and pay the applicable rates. Southern has FCC authority to act as a resale common carrier and has complied with the legal requirements imposed upon it, including the requirement that it not refuse reasonable requests for service. The Second Circuit in *Eastern Microwave* concluded that the fact that EMI operated under FCC approved tarrifs, which a particular cable TV system might not meet, did not mean EMI exercised control over its recipients, nor did EMI's status as a resale carrier serving the receiver rather than the sender of the communication change that conclusion.

Plaintiff does not appear to address the fourth element of § 111(a)(3). The court finds that Southern exercises no control over its recipients and is indistinguishable in that respect from EMI. This court agrees with the reasoning of the Second Circuit and concludes that Southern meets the fourth requirement of § 111(a)(3).

■ The fifth requirement is that the carrier's activities with respect to the secondary transmission consist solely of providing wires, cables or other communications channels for the use of others. Defendants say that this passivity requirement applies to the carrier's conduct with respect to the secondary transmission. This section does not require total passivity but allows the carrier to engage in normal business activities such as marketing and promotional efforts. Prohibiting promotional activity would be contrary to the FCC policy of promoting entry into the resale common carrier field, would hinder the public's access to diverse programming and would not protect any rights that copyright owners might have in those transmissions. In *Eastern Microwave,* the defendant "complained bitterly" of EMI's promotional and marketing activities. Defendant argued that EMI provided wires, etc. for its own use because it was "selling" the Mets games. The court said, "Engaging in those normal business activities does not, however, constitute doing 'more than' providing wires, etc. Compliance with the ... requirement is met if a carrier does no more than provide wires, etc., 'with respect to the secondary transmission.'" *Id.,* 691 F.2d at 131, n. 15 and accompanying text. Similarly, defendants say Southern's activities with respect to the secondary transmission are limited to providing wires, cables and other communications channels for the use of others.

Plaintiff says that Southern does not meet this requirement, first, because Southern is not passive with respect to the secondary transmission, but instead actively manipulates that transmission by adding its own material to the "vertical blanking interval" (VBI).[1] Second, plaintiff says, Southern fails to meet the requirement because it "sells" WTBS, not just a communications channel. Plaintiff's argument is that Southern's financial success depends upon the marketability of the content of Turner's transmission. Southern's income depends not only on the number of cable systems that desire the WTBS signal, but also on the number of subscribers each cable system attracts because Southern contracts with the cable systems to provide the WTBS signal for 10¢ per subscription per month. "Hubbard Statement of Facts" VII at 30 and sources cited therein. Thus, plaintiff says, Southern is vitally interested in the content of Turner's signal because

1. *See* "Hubbard's Statement of Facts" VI for technical explanation of VBI.

the signal is what Southern is selling, not just a communications channel. Southern's activities, therefore, do not consist solely of providing wires, cables and other communication channels for the use of others.

The court finds that Southern's activities with respect to the secondary transmission consist solely of providing wires, cables or other communications channels for the use of others. The court agrees that this section does not prohibit normal business activities such as marketing and promotional efforts. Southern does not "sell" WTBS and violate the exemption merely because demand for its services from cable companies is dependent upon demand for the WTBS signal from cable subscribers. While Southern recognizes this relationship in its fee arrangements and is "vitally interested" in the quality of WTBS's signal, those interests do not rise to the level of activities inconsistent with the passive carrier role.

The court also agrees with defendants that Southern's use of the VBI is not relevant to a consideration of Southern's activities with respect to the retransmission of WTBS's signal. Hubbard has no copyright interest in the material inserted in the empty space of Turner's video signal. The VBI is a means of communication totally distinct from the TV signal itself. "Defendant's Joint Memo" at 46, n. 19 and authority therein. The case of *WGN Continental Broadcasting Co. v. United Video, Inc.*, 693 F.2d 622 (7th Cir.1982) is easily distinguishable because in that case the material inserted by the broadcaster, WGN, in the VBI and wrongfully deleted by the carrier, United Video, was sufficiently related to the news programs to comprise a single copyrighted audiovisual work. United Video lost the passive carrier exemption because it did not retransmit WGN's signal intact but instead deleted the broadcaster's information in the VBI and substituted its own. *Id.* at 624 and 625. That situation is very different from Southern's insertion of material in an otherwise blank spot on the signal. Such use of the VBI does not disqualify Southern from the exemption.

The court has concluded that Southern meets each of the requirements of § 111(a)(3)'s carrier exemption. Consequently, Southern's secondary transmissions in this case cannot form the basis for liability for copyright infringement.

D. *Section 111(c) The Compulsory License*

Section 111(c) embodies the compulsory licensing scheme central to enactment of Congress' compromise in the Copyright Act of 1976. *See* discussion of purposes of § 111 in part IIIA, *supra*. Although plaintiff initially seemed to argue that Turner and Southern together had created a cable network or system ineligible for the compulsory license of § 111(c)(1), mostly because of the commercial substitution practice, *see* "Plaintiff's Memo" at 22–32, Hubbard apparently now concedes that § 111(c) is largely relevant as an aid to the court in interpreting § 111(a). *See* Statements at Oral Argument and "Plaintiff's Letter Brief."

Plaintiff's main argument is that § 111(c) and, in particular the prohibition on commercial substitution by cable companies found in § 111(c)(3), evidences a congressional intent to protect the local broadcaster. Plaintiff also argues that commercial substitution prevents application of the § 111(c) compulsory license to Southern's cable system customers. Section 111(c)(1) applies to "secondary transmission to the public by a cable system of a primary transmission made by a broadcast station." The legislative history of § 111(c) states:

> The compulsory license applies, therefore, to the carriage of the over-the-air broadcast signals and is inapplicable to the secondary transmission of any nonbroadcast primary transmission such as a program originated by a cable system or a cable network. The latter would be subject to full copyright liability under other sections of the legislation.

House Report at 93, U.S.Code Cong. & Admin.News 1976, p. 5707. Since South-

ern's cable customers are not carrying the over-the-air signal broadcast to the Atlanta market but instead carry a nonbroadcast signal with substituted national commercials sent by direct interconnection, plaintiff claims that Southern's customers do not qualify for the compulsory license. If a cable system does not have a compulsory license, plaintiff maintains, all parties in the transmission chain are liable for contributory infringement if they possess knowledge or control of, or benefit from, the infringement. *See* "Plaintiff's Letter Brief" at 1, 2 and 4.

Defendants claim that Turner and Southern operate completely within the parameters of the compulsory licensing system established in § 111. Defendants argue that Hubbard improperly seeks to alter the congressional and regulatory balancing of complex competing interests embodied in § 111 by this action. *See* "Defendants' Joint Memo" at 52–59; "Defendants' Joint Reply Memo" at 4–6, and at 17–21. The compulsory licensing system is not, as plaintiff suggests, a narrow exception to normal rules of copyright liability. Instead, it constitutes a congressionally mandated grant of a broad copyright license to the cable industry to retransmit copyrighted works embodied in the programming of broadcast stations. A finding that Southern is entitled to the § 111(a) exemption, defendants say, facilitates the workings of the § 111(c) compulsory licensing scheme, thus promoting the policies and purposes Congress hoped to achieve in § 111.

The court agrees that an understanding of § 111(c) is important to a proper interpretation of § 111(a). While the court has examined the availability of the § 111(a) exemption to Southern in part IIIC, *supra* by analyzing the five specific requirements of that section, it is true that the applicability of § 111(a) should not be determined without considering the effect of an exemption on the compulsory licensing scheme of § 111(c) and on attainment of the dual goals of § 111 as a whole. The Second Circuit in *Eastern Microwave*, after concluding that EMI met the specific requirements of § 111(a), also considered the im-

pact imposition of liability would have on the compulsory licensing scheme. The court explained:

> Interpretation of the Act must occur in the real world of telecommunications, not in a vacuum. The center-piece of the compromise reflected in the Act is the compulsory licensing scheme. That scheme is predicated on and presupposes a continuing ability of CATV systems to receive signals for distribution to their subscribers ....
>
> Congress drew a careful balance between the rights of copyright owners and those of CATV systems, providing for payments to the former and a compulsory licensing program to insure that the latter could continue bringing a diversity of broadcasted signals to their subscribers. The public interest thus lies in a continuing supply of varied programming to viewers. Because CATV systems served by intermediate carriers cannot provide their full current programming to their subscribers without the services of those carriers, *imposition of individual copyright owner negotiations on intermediate carriers would strangle CATV systems by choking off their life line to their supply of programs,* ... and, most importantly, would frustrate the congressional intent reflected in the Act by denying CATV systems the opportunity to participate in the compulsory licensing.

*Eastern Microwave*, 691 F.2d at 132–33 (footnotes omitted). This court concurs in that analysis.

The practice of commercial substitution by WTBS, as opposed to substitution by the cable company itself, does not violate § 111(c)(3) and result in loss of the compulsory license for Southern's cable customers. That practice does not change the nature of the secondary transmissions by the cable systems "of a primary transmission made by a broadcast station." The transmission, whether by UHF or direct interconnection, still meets the definition of primary transmission in § 111(f), and is still made by a broadcast station. The House Report that distinguishes between over-the-air broadcast signals and nonb-

roadcast cable-originated transmission predated the advent of this technology and does not compel the conclusion that only "over the air" signals and their retransmission qualify for the compulsory licensing scheme of § 111(c)(1). Much of plaintiff's argument here is really a variation of its argument that § 111(b) applies to these transmissions, discussed in § IIIB, *supra,* and the court rejects that argument. Southern's cable customers qualify for the § 111(c)(1) compulsory licensing scheme.

The court is persuaded that application of the § 111(a) carrier exemption to Southern is compatible with application of the § 111(c) compulsory license to Southern's customers and, in fact, furthers the dual goals embodied in § 111.

## IV. *Conclusion*

The court has concluded that Southern is entitled to the carrier exemption of § 111(a)(3) and its cable customers fit within the compulsory licensing scheme of § 111(c). Thus, Southern as a matter of law is not liable for copyright infringement in its retransmissions of the five works at issue. Accordingly, Turner as a matter of law cannot be liable as a contributory infringer. In addition, there has obviously as a matter of law been no conspiracy to infringe Hubbard's copyrights.

On a motion for summary judgment, the court must view all the evidence in the light most favorable to the non-moving party. *Jackson v. Star Sprinkler Corp. of Fla.,* 575 F.2d 1223, 1226 (8th Cir.1978). Summary judgment may only be granted when the pleadings, depositions, interrogatory answers, admissions, and affidavits show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Scherr Construction Co. v. Greater Huron Development Corp.,* 700 F.2d 463, 465 (8th Cir.1983). Only if "the moving party has established [the] right to a judgment with such clarity as to leave no room for controversy and the non-moving party is not entitled to recover under any discernible circumstances" is summary judgment appropriate. *Butler v. MFA Life Ins. Co.,* 591 F.2d 448, 451 (8th Cir.1979).

The court finds that there are no genuine issues of material fact in dispute and that the entire record, viewed in the light most favorable to plaintiff, establishes that plaintiff is not entitled to recover as a matter of law under any discernible circumstances. Accordingly, defendants' motion for summary judgment will be granted and plaintiff's motion for summary judgment will be denied.

Upon the foregoing,

IT IS ORDERED That defendant Turner Broadcasting System, Inc.'s and Southern Satellite System, Inc's joint motion for summary judgment be and hereby is granted.

IT IS FURTHER ORDERED That plaintiff Hubbard Broadcasting, Inc.'s motion for summary judgment be and hereby is denied.

IT IS FURTHER ORDERED That plaintiff's complaint be and hereby is dismissed with prejudice.

IT IS FINALLY ORDERED That the Clerk enter judgment as follows:

> IT IS ORDERED, ADJUDGED AND DECREED That defendants' motion for summary judgment is granted and plaintiff's complaint is dismissed with prejudice.