**EASTERN MICROWAVE, INC.,**
**Plaintiff-Appellant,**

v.

**DOUBLEDAY SPORTS, INC.,**
**Defendant-Appellee.**

**No. 1403, Docket 82–7243.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 9, 1982.

Decided Oct. 13, 1982.

Certiorari Denied Feb. 22, 1983.
See 103 S.Ct. 1232.

John D. Matthews, Arnold P. Lutzker, John P. Schnitker, David J. Wittenstein, Dow, Lohnes & Albertson, Washington, D. C., for plaintiff/appellant; Sabin, Bermant & Blau, New York City, and Bond, Schoeneck & King, Syracuse, N. Y. of counsel.

James F. Fitzpatrick, David H. Lloyd, Leonard H. Becker, Robert Alan Garrett, Vicki J. Divoll, Robert N. Weiner, Arnold & Porter, Washington, D. C., and Robert J. Hughes, Jr., Benjamin J. Ferrara, David E. Peebles, Hancock, Estabrook, Ryan, Shove & Hust, Syracuse, N. Y., for defendant/appellee; Gerard H. Toner, New York City, of counsel.

Before VAN GRAAFEILAND and PIERCE, Circuit Judges, and MARKEY,

Chief Judge of the U. S. Court of Customs and Patent Appeals.*

MARKEY, Chief Judge, United States Court of Customs & Patent Appeals:

Appeal from a judgment of the district court for the Northern District of New York, denying plaintiff's and granting defendant's motion for partial summary judgment, holding that a retransmitter of television signals publicly performed a copyrighted work among those signals and was not an exempt carrier. We reverse.

*Background*

Plaintiff, Eastern Microwave, Inc. (EMI) is licensed by the Federal Communications Commission (FCC) to provide services as a communications common carrier. EMI's services include the retransmission of the television signals of broadcast stations to markets outside the service areas of the broadcast stations. Retransmission is accomplished by converting broadcast signals into microwave signals and relaying the microwave signals via satellite or a string of line-of-sight terrestrial microwave repeater stations. Retransmitted signals are delivered by EMI to the headends of the customers of its transmitting services, cable television (CATV) systems, which then reconvert the microwave signals to television signals for distribution to and viewing by the CATV system's subscribers.[1]

EMI has been retransmitting the original television signals of WOR–TV of New York City by repeater stations since 1965, and more recently by both repeater stations and satellite. WOR–TV has not objected to that retransmission.

Doubleday Sports, Inc. (Doubleday), owner of The New York Mets baseball team, contracts with WOR–TV to broadcast approximately 100 Mets games per season. It is undisputed that The Mets, i.e., Doubleday, owns the copyright in the audiovisual work represented by the Mets games. Since 1965, EMI has retransmitted the entirety of WOR–TV's signals, without selection among programs and without modification or mutilation in any manner of the signals received and retransmitted. Since 1980, when WOR–TV became a twenty-four hour channel, EMI has retransmitted all twenty-four hours of WOR–TV programming, with no editing or selection among programs.[2] Hence, EMI's retransmission of WOR–TV's television signals includes the Mets games, along with numerous other copyrighted audiovisual works. EMI did not request permission of Doubleday or of any other copyright owner to retransmit the signals of WOR–TV.

In March of 1981, EMI was notified by Doubleday of the latter's view that retransmission of WOR–TV Mets game broadcasts infringed Doubleday's copyright. Thereupon, EMI instituted this action, seeking a declaratory judgment that it was a passive carrier exempt from copyright liability under 17 U.S.C. § 111(a)(3)[3] of the Copyright Act of 1976 (Act). Doubleday moved for partial summary judgment declaring EMI's retransmissions non-exempt,

---

* Chief Judge Howard T. Markey, U. S. Court of Customs and Patent Appeals, sitting by designation.

1. EMI also delivered its microwave signals to two hotels and a casino in Las Vegas.

2. Before WOR–TV became a twenty-four hour channel, EMI retransmitted the signals of WCBS–TV, New York, when WOR–TV was off the air.

3. 17 U.S.C. § 111(a)(3) provides:
   The secondary transmission of a primary transmission embodying a performance or display of a work is not an infringement of copyright if—

(3) The secondary transmission is made by any carrier who has no direct or indirect control over the content or selection of the primary transmission or over the particular recipients of the secondary transmission, and whose activities with respect to the secondary transmission consist solely of providing wires, cables, or other communications channels for the use of others: *Provided,* that the provisions of this clause extend only to the activities of said carrier with respect to secondary transmissions and do not exempt from liability the activities of others with respect to their own primary or secondary transmissions; ...

and for dismissal of the complaint. EMI cross-moved for partial summary judgment denying Doubleday's motion and granting judgment for EMI. EMI amended its complaint, adding a contention that its transmissions are not "public performances" and that it does not therefore infringe Doubleday's right to display the copyrighted works publicly as required by 17 U.S.C. § 106(5).[4]

The district court, stating that the parties did not dispute that EMI "performs" the WOR–TV signals, held that EMI's retransmissions were to the public, and that EMI is not exempt because it selected WOR–TV's signals, exercised control over recipients of its retransmissions, and did not limit its activities to providing wires, cables, or other communications channels for the use of others. The district court granted Doubleday's motion and denied EMI's.

### Issue

The dispositive issue is whether EMI's retransmission activity is exempt under 17 U.S.C. § 111(a)(3), supra, note 3.[5]

### Opinion

This case, one of first impression in this circuit, has its genesis in the burgeoning technological advances of the communications industry. Like others before it, the case requires interpretation and application of statutes enacted before adoption of the involved communications arrangements.

Because the issues framed by the cross motions for summary judgment involve application of legal standards under the Act to the relatively undisputed facts concerning the nature of EMI's activities, plenary review of the district court's judgment is appropriate. *United Artists Television, Inc. v. Fortnightly Corp.*, 377 F.2d 872, 874 n.2 (2d Cir. 1967) *rev'd on other grounds*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176, *reh. denied*, 393 U.S. 902, 89 S.Ct. 65, 21 L.Ed.2d 190 (1968). *See also Baranow v. Gibraltar Factors Corp. (In re Hygrade Envelope Corp.)*, 366 F.2d 584, 587–89 (2d Cir. 1966).

Confronted with the need to divine and apply the intent of Congress, and with a statute enacted in the technological milieu of an earlier time, we "look to the 'common sense' of the statute ..., to its purpose, [and] to the practical consequences of the suggested interpretations ... for what light each inquiry might shed." *New York State Commission on Cable Television v. FCC*, 571 F.2d 95, 98 (2d Cir.), *cert. denied*, 439 U.S. 820, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978).

EMI's activities, described as those of an intermediate or "resale" transmitter, are a new and mixed breed. Unlike those of broadcasters and CATV systems, they do not include the sending of signals intended for reception as such on television sets.[6] Like those of some CATV systems, they do include the acquisition "off the air" of

---

**4.** 17 U.S.C. § 106(5) provides:
Subject to sections 107 through 108, the owner of a copyright under this title has the exclusive rights to do and to authorize any of the following:
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

**5.** The Register of Copyrights filed a brief *amicus curiae* limited to an argument that EMI's retransmission service constitutes a "public performance" of the audiovisual works retransmitted. In view of our disposition, we need not and do not decide that question in this case.

**6.** EMI transmissions along its string of microwave repeaters are not so receivable. Though not so intended, its satellite transmissions can

be received by a growing number of "dishes" and associated equipment purchased by individual homeowners and others. Unauthorized interception of private communications has been held subject to criminal and civil liability. *See National Subscription Television v. S & H TV*, 644 F.2d 820 (9th Cir. 1981); *American Television and Communications Corp. v. Western Techtronics, Inc.*, 529 F.Supp. 617 (D.Colo. 1982) (microwave transmissions); *Home Box Office, Inc. v. Advanced Consumer Technology*, No. 81–Civ. 559 (MDS) (S.D.N.Y. Nov. 4, 1981) (same); *Home Box Office, Inc. v. Pay TV of Greater New York, Inc.*, 467 F.Supp. 525 (E.D. N.Y.1979). See also FCC, *Public Notice, Unauthorized Interception and Use of Multipoint Distribution Service Transmissions*, No. 11850 (January 24, 1979).

broadcast signals. Unlike the activities of older, established common carriers, e.g., the telephone company, they include carrying the communications desired by receivers rather than those desired by senders. Also unlike older common carriers, EMI is paid by receivers rather than by senders. Like those of older common carriers, EMI's activities are paid for as services and involve transmittal of the entire signal without change.

A television broadcast station sends out "on-the-air" signals at frequencies within the broadcast band. Television sets positioned to receive those signals convert them into an audible and visible, i.e. "audiovisual", display. In rendering a retransmission service, the first step is reception of the same "off-the-air" television signals of a broadcast station. The next step of the retransmitter, however, is not conversion into an audiovisual display, but conversion to a frequency within the microwave band. The third step is transportation of the microwave signal. As above indicated, EMI's microwave signal is transported in one of two ways: (1) through a string of line-of-sight terrestrial repeater stations; or (2) directly to a receiver dish at the RCA American Communications, Inc. (RCA) earth station uplink site, where it is converted to another microwave frequency, transmitted to an RCA satellite transponder leased by EMI, and relayed by the transponder back to earth. Whichever transporting method is used, the last retransmission step is delivery of the microwave signals to headends of CATV systems, EMI's customers. Distribution of the signals received at a headend, to subscribers for display on their television sets, is a step performed entirely by the CATV system and forms no part of the activities or services of EMI. The retransmission services provided by EMI are thus an intermediate link in an overall chain of distribution of television broadcast signals, a link making broadcast signals originally available in one are available in microwave form at the headends of CATV distribution systems positioned in other areas.

The present activity of EMI cannot be viewed in historical isolation. In 1968, the FCC suspended the hearing process required by its 1966 rules in favor of proposed rules requiring cable systems in the top 100 markets to obtain consent from distant stations before transmitting their signals. *Notice in Docket No. 18397*, 15 F.C.C.2d 417 (1968). That resulted in denial of virtually all transmission rights, and designation of the action as a "freeze" on cable growth.

At about the same time as the 1968 FCC action, distribution of microwave-relayed television signals by CATV systems to subscribers was held not a "performance" under the Copyright Act of 1909, and CATV systems were therefore not liable for copyright infringement. *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176, *reh. denied*, 393 U.S. 902, 89 S.Ct. 65, 21 L.Ed.2d 190 (1968); *Teleprompter Corp. v. Columbia Broadcasting Sys., Inc.*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974).

Congress over the ensuing years worked out a legislative compromise, one part of which was the provision in the Act of a definition of "to perform or display a work publicly" having a breadth sufficient to encompass the distribution of relayed signals by CATV systems. Recognizing that a process requiring each CATV system to obtain the consent of or negotiate with numerous individual copyright owners would be unworkable, *see, Malrite T.V. of New York v. Federal Communications Commission*, 652 F.2d 1140, 1148 (2d Cir. 1981), *cert. denied, sub nom., National Football League v. Federal Communications Commission*, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982), Congress established as the other part of the compromise the compulsory license program set forth in the Act.[7]

7. 17 U.S.C. § 111(c)(1) provides:
    Subject to the provisions of clauses (2), (3) and (4) of this subsection, secondary transmissions to the public by a cable system of a primary transmission made by a broadcast station licensed by the Federal Communications Commission or by an appropriate governmental authority of Canada or Mexico

Under the congressionally mandated scheme, television broadcast stations like WOR–TV continue to pay license or royalty fees directly to copyright owners like Doubleday, while CATV systems pay license fees under their compulsory licenses to the United States Copyright Office in accord with formulae provided in 17 U.S.C. § 111(d)(2)(B).[8] The fees paid by CATV systems are distributed to copyright owners like Doubleday by the Copyright Royalty Tribunal (Tribunal), as provided for in 17 U.S.C. § 111(d)(5).[9] The Congressional scheme thus provided for compensation from CATV systems to copyright owners measured by the number of cable viewers or potential viewers, and placed the responsibility for payment of that compensation on the CATV systems.

### Exemption

We begin, as we must, with the statute, 17 U.S.C. § 111(a)(3), supra, note 3, under which EMI is entitled to the "carrier"[10] exemption if its activities are passive, merely retransmitting exactly what it receives, if it exercises no control over the content or selection of the primary transmission, or over the particular recipients of its transmission, and if its retransmission activities consist solely of providing wires, cables, or other communications channels for the use of others.[11]

and embodying a performance or display of a work shall be subject to compulsory licensing upon compliance with the requirements of subsection (d) where the carriage of the signals comprising the secondary transmission is permissible under the rules, regulations, or authorizations of the Federal Communications Commission.

**8.** 17 U.S.C. § 111(d)(2)(B) provides in part:

(B) except in the case of a cable system whose royalty is specified in subclause (C) or (D), a total royalty fee for the period covered by the statement, computed on the basis of specified percentages of the gross receipts from subscribers to the cable service during said period from the basic service of providing secondary transmissions of primary broadcast transmitters, as follows:

(i) 0.675 of 1 per centum of such gross receipts for the privilege of further transmitting any nonnetwork programming of a primary transmitter . . .

(ii) 0.675 of 1 per centum of such gross receipts for the first distant signal equivalent;

(iii) 0.425 of 1 per centum of such gross receipts for each of the second, third, and fourth distant signal equivalents;

(iv) 0.2 of 1 per centum of such gross receipts for the fifth distant signal equivalent and each additional distant signal equivalent thereafter; . . .

**9.** 17 U.S.C. § 111(d)(5) reads:

(5) The royalty fees thus deposited shall be distributed in accordance with the following procedures:

(A) During the month of July in each year, every person claiming to be entitled to compulsory license fees for secondary transmission shall file a claim with the Copyright Royalty Tribunal, in accordance with requirements that the Tribunal shall prescribe by regulation.

**10.** Though Doubleday insists on comparing EMI with the telephone company, the statute speaks in terms of "any carrier", 17 U.S.C. § 111(a)(3), supra, note 3, and EMI is licensed by the FCC as a common carrier, infra, note 14.

**11.** As reflected in the text, we believe a proper application of the statute, and continuation of its overall scheme as designed by Congress, requires that EMI's activities challenged in this case be perceived as falling within the intent of 17 U.S.C. § 111(a)(3). Later pronouncements of the Congress cannot be looked to as indicative of its intent at the time of a statute's enactment. Of general interest, however, is a recent House Committee Report on H.R. 5949, 97th Cong., 2nd Sess. (May 17, 1982), and its comment on this very case:

In the course of Committee deliberations on this legislation, a decision was issued in a case involving an interpretation of Section 111(a)(3), *Eastern Microwave, Inc. v. Doubleday Sports, Inc.*, 534 F.Supp. 533 (N.D., N.Y., 1982), which leaves the cable industry in a state of turmoil. The holding of that case was that the carrier, Eastern Microwave, Inc., failed to qualify for the Section 111(a)(3) exemption. In the Committee's view, the decision incorrectly construed the carrier exemption. If the decision is applied to other parties, all satellite resale carriers could be held liable for copyright infringement when they deliver distant signals to cable systems. Further, terrestrial microwave carriers could also be in danger of losing their exemption. These carriers are the primary means whereby cable systems receive distant signals for retransmission to cable subscribers; rather than face copyright liability, they may suspend broadcast retransmission. As a result, the signal carriage standards of the FCC could be undone, and the entire compulsory licensing scheme undercut, which would be

The first question presented is thus whether EMI exercised "control over selection of the primary transmission" when it chose to retransmit the WOR–TV signal via satellite. Via its terrestrial microwave repeaters, EMI retransmits the broadcast signals of WOR–TV, WNEW, WPIX, WCBS–TV, WSBK, WSTM, WPHL, WIXT, WUAB, CHCH, CKWS, WQXR–FM, Home Box Office, Prism, and programming of the Pennsylvania Educational Television Network. With respect to its extra-terrestrial activity, only one satellite transponder was made available to EMI, enabling satellite retransmission of only one broadcaster's signals.

With satellite transmission of but one broadcaster's signals available, EMI naturally sought to retransmit those of a marketable station. If EMI's CATV satellite customers had preferred the signals of WNEW, for example, over those of WOR–TV, EMI would presumably have chosen the former over the latter. Based on demand shown by numerous CATV systems surveyed and solicited, the marketable station sought proved to be WOR–TV. In meeting that demand by supplying the WOR–TV signal, EMI does so passively, retransmitting exactly what it receives and the entirety of what it receives. That one-time determination by EMI to retransmit WOR–TV's signals reflects EMI's limitation to one technical facility and the realization that once contracts are entered, EMI cannot retransmit any other signals on that facility.

Technical restrictions which forced EMI to make an initial, one-time determination to retransmit the signals of a particular station, whatever the content of those signals, do not evidence the "control over the content and selection of the primary transmission" intended to be precluded under

Section 111(a)(3). In the ordinary common carrier context, the carrier must render its service to all comers, denying it to none on the basis of content, and must not select or choose among those who seek to use its service, on any basis other than a legitimate business reason. When the communication service is technologically limited to one sender, however, a type of "selection" is impelled. That type of forced selection cannot be the type precluded by the statute in the context here presented, for to so hold would be to require that exemption be denied to any carrier that did not retransmit every television broadcast of every television station in the country. Moreover, if station selection were the type of "selection" precluded, a failure to retransmit the signals of one station could be viewed as a control of content forbidden to carriers by the Act.[12] To hold that "selection" means station selection would thus emasculate the exemption provision of the Act with respect to intermediate carriers, in derogation of the duty of upholding statutory provisions not contrary to reason, logic, common sense or the Constitution.

To remain exempt, a carrier-retransmitter must avoid content control by retransmitting exactly what and all of what it receives, as EMI does here. To do otherwise could be perceived as the carrier's making the transmission its own. That EMI serves customers at one end of the communications chain, and telephone companies serve customers at the other, is not controlling, so long as neither injects its own communications into that chain. If WOR–TV had requested and paid EMI to transmit its broadcast signal, for example, the traditional common carrier context would have been created. That EMI serves numerous receiving CATV systems, with the one available set of signals those cus-

---

antiethical [sic] to the intent of this committee and the public interest.

There has never been any doubt by this Committee that carriers are exempt from copyright liability when retransmitting television signals to cable systems via terrestrial microwave or satellite facilities. H.R.Rep. No.559, 97th Cong., 2d Sess. 4 (1982).

12. Moreover, the futility of embuing technological limitations with copyright significance is illustrated by a consideration that if selection of one station when only one is technically possible precludes exemption, a selection of two, or three, or thirteen, or whatever number (less than the total) was technologically possible, would also preclude exemption.

tomers prefer, rather than serving numerous sending broadcasters, is a difference insufficient to deny EMI the statutory carrier exemption on the ground that it is controlling the content or selection of that set of signals.

The second requirement, an absence of direct or indirect control over the particular recipients of its retransmission, is fully satisfied by EMI. It is undisputed that the "particular recipients"[13] of EMI's retransmissions are the many CATV systems which it serves under contract. That it renders its service to certain CATV systems and not others does not itself constitute, however, any control, direct or indirect, over particular recipients. As above indicated, the so-called "resale carriers" are somewhat new in the common carrier world, in that they serve the receiver rather than the sender of a communication. EMI is subject to FCC regulation and has been granted authority under 47 U.S.C. § 214 to operate as a common carrier.[14] As such, it is bound to furnish its communications services upon reasonable requests. 47 U.S.C. § 201(a). That EMI operates under FCC-approved tariffs which a particular CATV system might not be able to meet does not mean that EMI exercises control over its recipient CATV customers. The record indicates that no reasonable request for its services was ever refused by EMI. EMI has thus not exercised "control over the particular recipients" of its transmissions within the meaning and intent of 17 U.S.C. § 111(a)(3).

EMI also meets the third requirement, that it merely provide wires, cables, or other communications channels for the use of others. As above indicated, the "others" here are the receiving CATV systems which cannot afford their own wires, cables, and channels, rather than the originating senders who use (and cannot afford their own) wires, cables, and channels of more traditional common carriers like a telephone company. EMI provides the wires and cables of its repeater stations for use of its CATV customers in acquiring the signals of WOR–TV and those of many other originators. It provides its single satellite transponder for use of its CATV customers in acquiring the signals of necessarily one originator, i.e., WOR–TV.

Doubleday argues in effect that EMI provides wires, etc., for its own use because it is "selling" the Mets games.[15] EMI is selling, however, only its transmission services, CATV systems paying therefore on the basis of number of subscribers only up to a maximum compensation of $3,000 regardless of the content of the retransmitted signals. When the maximum is reached, the payment remains the same, regardless of the number of subscribers. EMI transmits nothing of its own creation. It transmits only to the headends of its customers who employ its services in lieu of obtaining their own wires, cables, etc., infra, note 17. That it transmits particular signals in response to contracts with its customers specifying those signals, and that it announces to potential customers its ability to transmit those signals, are actions not in conflict with an exempt carrier status. EMI's activities with respect to its transmissions thus consist of nothing more than providing wires, cables, and other communication

13. Because Congress was focusing on CATV systems which had been themselves acquiring broadcast signals and making a "secondary transmission" thereof to their subscribers, it may arguably have intended that "particular recipients" be read as the viewers-subscribers of the CATV system. If so, EMI's activities are even more divorced from control of those recipients.

14. EMI has been licensed by the FCC to provide point-to-multipoint distribution of the WOR–TV signal via its terrestrial relay facilities and the transponder leased from RCA. *In re Applications of Eastern Microwave, Inc.,* 70 F.C.C.2d 2195 (1979).

15. Doubleday complains bitterly of EMI's promotional and marketing efforts. Engaging in those normal business activities does not, however, constitute doing "more than" providing wires, etc. Compliance with the third requirement is met if a carrier does no more than provide wires, etc., "with respect to the secondary transmission." 17 U.S.C. § 111(a)(3).

channels for use of others within the meaning and intent of 17 U.S.C. § 111(a)(3).[16]

### The Compulsory License Scheme

Interpretation of the Act must occur in the real world of telecommunications, not in a vacuum. The centerpiece of the compromise reflected in the Act is the compulsory licensing scheme. That scheme is predicated on and presupposes a continuing ability of CATV systems to receive signals for distribution to their subscribers. Doubleday is but one of numerous copyright owners whose works may be broadcast by WOR–TV. EMI serves as a signals conduit between the performance by WOR–TV and the performance by its CATV system customers. Adoption of Doubleday's position would stand all copyright owners athwart that conduit between the original broadcast and the opportunity for subsequent performances by CATV systems. In so doing, it would defeat Congress' intent by imposing on EMI the unworkable separate nego-

tiations with numerous copyright holders from which the Act sought to free CATV systems.

Congress drew a careful balance between the rights of copyright owners and those of CATV systems, providing for payments to the former and a compulsory licensing program to insure that the latter could continue bringing a diversity of broadcasted signals to their subscribers. The public interest thus lies in a continuing supply of varied programming to viewers. Because CATV systems served by intermediate carriers cannot provide their full current programming to their subscribers without the services of those carriers,[17] imposition of individual copyright owner negotiations on intermediate carriers would strangle CATV systems by choking off their life line to their supply of programs, would effectively restore the "freeze" on cable growth described above, and, most importantly, would frustrate the congressional intent reflected in the Act by denying CATV systems the

---

16. Our attention has been invited to *WGN Continental Broadcasting Company and Albuquerque Cable Television, Inc. v. United Video, Inc.,* 685 F.2d 218 (7th Cir. 1982). There, United Video retransmitted WGN's signal to cable systems, a service similar to EMI's. Unlike EMI's, however, United Video actively removed material inserted by WGN into the "vertical blanking interval" and substituted business news. *Id.* at 219.

In *WGN,* the court recognized, as do we, that passive intermediaries like EMI are entitled to the exemption:

The exemption thus allows carriers such as United Video to act as purely passive intermediaries between broadcasters and the cable systems that carry the broadcast signals into the home, without incurring any copyright liability. The cable system selects the signals it wants to retransmit, pays the copyright owners for the right to retransmit their programs, and pays the intermediate carrier a fee for getting the signal from the broadcast station to the cable system. The intermediate carrier pays the copyright owners nothing provided it really is passive, like a telephone company. *Id.* at 220.

Because United Video was not passive, it was held non-exempt. As indicated, supra, note 5, we do not here discuss the question of whether an intermediate resale transmitter publicly displays or performs when it transmits. Similarly, we do not comment on the remarks touching that question in *WGN* or on the effect, if any, on that question of United Video's inject-

ing its "own" programming. There is an indication, in *WGN* and in the briefs here, that an interpretation limiting "public performance" to transmissions capable of reception by the public would necessarily render the "carrier" exemption superfluous. When the 1965 version of the bill eliminated "common carrier," the late Professor Derenberg wrote the House Judiciary Committee, fearing that a CATV system that leased AT&T equipment to distribute signals directly to the public would render AT&T liable for infringement. The exemption was reinstated. Thus common carriers whose equipment is used to distribute signals to CATV subscribers have a continuing need for the exemption to avoid liability for communicating "to the public" as expressed in the pertinent portion of 17 U.S.C. § 101:

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17. EMI retransmits WOR–TV's signals to six hundred CATV systems which cannot provide retransmission for themselves because satellite transponders are unavailable and because the capital costs of repeater stations are prohibitive.

opportunity to participate in the compulsory licensing program. After years of consideration and debate, Congress could not have intended that its work be so easily undone by the interposition of copyright owners to block exercise of the licensing program by cable systems.[18]

### The Royalty Scheme

EMI is, like all common carriers, compensated for its transmission services as such. In accord with its FCC-approved tariff, and as above indicated, EMI is paid by each CATV system in relation to the number of its subscribers up to a maximum of $3,000. The fee does not increase thereafter, regardless of the number of a CATV system's subscribers. In contrast, the royalty fee paid by each CATV system under the Act is limited to no maximum, but is entirely based on percentages of gross receipts from subscribers to the CATV service in accord with 17 U.S.C. § 111, supra, note 8.

It is undisputed that if each CATV system had its own string of microwave repeaters or satellite transponder it would be liable through the Tribunal to a copyright owner for only the one established royalty fee when and if it publicly performed the copyrighted work by making it available to its subscribers; and that such an integrated CATV system would not be liable for a second royalty fee for having itself retransmitted the original broadcast signal to its headend. We are unpersuaded by counsel's urging that a different result should obtain when a separate entity, e.g. EMI, supplies the retransmission service. That EMI is a separate entity supplies no justification for subjecting EMI to copyright liability when those same activities would not result in copyright liability if carried out by the CATV systems served by EMI. In the Act, Congress established a specific scheme for recognition of the rights of copyright owners. Under that scheme those rights are not unlimited. Neither are they rendered superior to the rights of viewers. If this court were to impose here a requirement that intermediate carriers negotiate with and pay all copyright owners for the right to retransmit their works, assuming such requirement were not impossible to meet, such action would produce a result never intended by Congress, namely a substantially increased royalty payment to copyright owners with no increase in number of viewers.[19]

### Conclusion

In summary, given the nature of EMI's services here involved, and the role those services play in the overall chain of signals distribution, we conclude that EMI is not in

**18.** It is asserted that various groups are at best disenchanted with the compulsory license scheme. If so, their remedy lies with the Congress, not the courts. *See* Remarks of Bowie Kuhn, Commissioner of Baseball, June 2, 1982: "We have always taken the position that the compulsory license should be repealed and replaced by a marketplace solution. We continue to believe strongly that complete repeal of the compulsory license is the proper course." Hearings Before the Subcommittee of Telecommunications, Consumer Protection and Finance of the House Committee on Energy and Commerce, 97th Cong., 2d Sess. 46–47 (1982). *See also* Speech by Mark S. Fowler, FCC Chairman, to Association of Independent Television Stations Inc. (Jan. 26, 1982); Hearings before the Senate Comm. on the Judiciary, 97th Cong., 1st Sess. 124–25 (1981) (Testimony of David Ladd); Letter of Asst. Atty. Gen. Robert A. McConnell, Justice Dept. Office of Legislative Affairs, to Chairman Rodino, House Judiciary Comm. (Mar. 20, 1982); U. S. Dept. of Commerce, National Telecommunications and Information Admin., *Cable Copyright, Alternatives to the Compulsory License* (Dec. 1981); Hearings Before the Subcomm. on Courts, Civil Liberties and the Admin. of Justice of the House Judiciary Comm., 97th Cong., 1st Sess. 51 (Prepared Statement of Clarence James, former Chairman of the Copyright Royalty Tribunal at 67) (Mar. 4, 1981).

**19.** EMI asserts that a royalty payment to Doubleday alone would amount to millions. Moreover, under the district court's rationale for denying exemption, RCA's retention of its transponder and retransmittal of the WOR–TV signal received from EMI, would require payment of four royalties to Doubleday and all other owners of copyrighted works broadcast by WOR–TV (one each from WOR–TV, EMI, RCA and the CATV systems) though the number of ultimate viewers would remain unchanged from the present number justifying payment of two royalties.

law infringing Doubleday's exclusive right to display its copyrighted work by passively retransmitting the entirety of WOR–TV's broadcast signal to the headends of its customer CATV systems, because those services are such as to fall within the exemption provided for in 17 U.S.C. § 111(a)(3). Reversal of the judgment appealed from is accordingly required.

REVERSED.