777 F.2d 393
 54 USLW 2329, 228 U.S.P.Q. 102, 1985
Copr.L.Dec. P 25,857,
12 Media L. Rep. 1476
 HUBBARD BROADCASTING, INC., a Minnesota corporation, Appellant,
v.
SOUTHERN SATELLITE SYSTEMS, INC., a Georgia corporation,
Turner Broadcasting System, Inc., a Georgia
corporation, Appellees.
 No. 84-5173.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 11, 1985.
Decided Nov. 13, 1985.
Rehearing Denied Dec. 17, 1985.
 
 Sidney Barrows, Minneapolis, Minn., for appellant.
 Duane W. Krohnke, Minneapolis, Minn., for appellees.
 Before LAY, Chief Judge, and HEANEY and FAGG, Circuit Judges.
 FAGG, Circuit Judge.
 
 
 1
 Hubbard Broadcasting, Inc. (Hubbard) appeals the dismissal of its copyright infringement action. That action, brought against Southern Satellite Systems, Inc. (Southern or Southern Satellite) and Turner Broadcasting System, Inc. (Turner or Turner Broadcasting), involves the interpretation and application of various provisions of section 111 of the Copyright Act of 1976, 17 U.S.C. Sec. 111. The district court, after examining the relevant provisions of section 111, concluded that neither Southern Satellite nor Turner was guilty of copyright infringement. Hubbard Broadcasting, Inc. v. Southern Satellite Systems, Inc., 593 F.Supp. 808, 823 (D.Minn.1984). We agree and affirm the district court's dismissal of Hubbard's action.
 
 Legislative and Factual Background
 
 2
 Section 111 of the Copyright Act of 1976 provides for a compulsory copyright licensing program applicable to cable systems that retransmit television signals containing copyrighted programming material. See 17 U.S.C. Sec. 111(c)-(d). Prior to the enactment of this licensing program, cable systems, unlike television broadcast stations, paid no copyright royalties even though cable systems, like television stations, transmitted copyrighted material to the general public. This situation was in large part the result of two Supreme Court decisions in which the Court concluded that the retransmission of television signals by cable systems did not constitute a "performance" under the Copyright Act of 1909, and therefore did not give rise to copyright liability. Teleprompter Corp. v. Columbia Broadcasting System, Inc., 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974); Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968); see also Capital Cities Cable, Inc. v. Crisp, --- U.S. ----, 104 S.Ct. 2694, 2705, 81 L.Ed.2d 580 (1984).
 
 
 3
 In revising the Copyright Act, however, Congress determined that cable systems should, in some instances, be required to pay copyright royalties to the creators of copyrighted programs. See H.R.Rep. No. 1476, 94th Cong., 2d Sess. 89, reprinted in 1976 U.S.Code Cong. & Ad.News 5659, 5704. At the same time, Congress "recognized that 'it would be impractical and unduly burdensome to require every cable system to negotiate [appropriate royalty payments] with every copyright owner' in order to secure consent for such retransmissions." Capital Cities Cable, Inc., 104 S.Ct. at 2706 (quoting H.R.Rep. No. 1476, 94th Cong., 2d Sess. 89, reprinted in 1976 U.S.Code Cong. & Ad.News at 5704); see also National Cable Television Association, Inc. v. Copyright Royalty Tribunal, 724 F.2d 176, 179 (D.C.Cir.1983) ("Individual marketplace negotiations * * * would entail inordinately high transaction costs.").
 
 
 4
 As a result, rather than require cable systems to contract with each program creator individually, Congress established a compulsory licensing program for qualifying cable systems. See 17 U.S.C. Sec. 111(c)-(d). Under this program, cable television systems pay a semiannual fee into the Register of Copyrights. Id. Sec. 111(d)(2). In return, cable systems receive a license entitling them to retransmit to their subscribers certain television signals containing copyrighted programming. See id. Sec. 111(c)-(d). The fees deposited by the cable systems are subsequently distributed to eligible copyright owners by the Copyright Royalty Tribunal. See id. Secs. 111(d)(5), 801(b)(3).
 
 
 5
 While determining that cable systems should be required to pay licensing fees for the retransmission of copyrighted programming, Congress also concluded that the compulsory licensing program would not be applicable in all instances. Specifically, Congress rejected application of the compulsory license to a cable system's rebroadcast of local television signals because Congress found "no evidence that the retransmission of 'local' broadcast signals by a cable operator threaten[ed] the existing market for copyright program owners." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 90, reprinted in 1976 U.S.Code Cong. & Ad.News at 5704. Congress further concluded that "the retransmission of network programming, including network programming which is broadcast in 'distant' markets, does not injure the copyright owner [since] [t]he copyright owner contracts with the network on the basis of his programming reaching all markets served by the network and is compensated accordingly." Id.
 
 
 6
 With respect to the retransmission of distant nonnetwork programming, however, Congress determined that the
 
 
 7
 retransmission of distant non-network programming by cable systems causes damage to the copyright owner by distributing the program in an area beyond which it has been licensed. Such retransmission adversely affects the ability of the copyright owner to exploit the work in the distant market. It is also of direct benefit to the cable system by enhancing its ability to attract subscribers and increase revenues.
 
 
 8
 Id. at 90, reprinted in 1976 U.S.Code Cong. & Ad.News at 5704-05. On the basis of these various determinations, Congress "concluded that the copyright liability of cable television systems under the compulsory license should be limited to the retransmission of distant non-network programming." Id. at 90, reprinted in 1976 U.S.Code Cong. & Ad.News at 5705; see 17 U.S.C. Sec. 111(d)(2)(A) and (d)(4); see also Christian Broadcasting Network, Inc. v. Copyright Royalty Tribunal, 720 F.2d 1295, 1303 (D.C.Cir.1983).
 
 
 9
 By specifically limiting the copyright liability of cable systems to the retransmission of distant nonnetwork programming, Congress clearly anticipated that television signals carrying this type of programming would be readily available to cable systems and their subscribers. See Eastern Microwave, Inc. v. Doubleday Sports, Inc., 691 F.2d 125, 132 (2d Cir.1982), cert. denied, 459 U.S. 1226, 103 S.Ct. 1232, 75 L.Ed.2d 467 (1983). One particularly important provision of the Copyright Act intended by Congress to help accomplish this goal is the carrier exemption of section 111(a)(3). This exemption protects from copyright liability communications carriers (here Southern) that retransmit secondarily the "primary transmission" of a licensed television broadcast station (here Turner or WTBS) to cable systems. See 17 U.S.C. Sec. 111(a), (f). This exemption is applicable, however, only if:
 
 
 10
 the secondary transmission [of the primary transmission] is made by a[ ] carrier who has no direct or indirect control over the content or selection of the primary transmission or over the particular recipients of the secondary transmission, and whose activities with respect to the secondary transmission consist solely of providing wires, cables, or other communications channels for the use of others * * *.
 
 
 11
 Id. Sec. 111(a)(3). In other words, communications carriers that are sufficiently passive with respect to the actual retransmission of television signals incur no copyright liability when acting as a communications conduit between the distant broadcast station and interested cable systems.
 
 
 12
 At the core of the relatively complex statutory scheme of section 111 is an attempt by Congress "to further the important public purposes framed in the Copyright Clause, U.S. Const. Art. I, Sec. 8, of rewarding the creators of copyrighted works and of 'promoting broad public availability of literature, music, and the other arts.' " Capital Cities Cable, Inc., 104 S.Ct. at 2706 (citations omitted). By enacting compulsory licensing provisions, Congress "not only [sought to] protect[ ] the commercial value of copyrighted works but also enhance[d] the ability of cable systems to retransmit such programs carried on distant broadcast signals, thereby allowing the public to benefit by the wider dissemination of works carried on television broadcast signals." Id. (footnote omitted); see also Eastern Microwave, Inc., 691 F.2d at 132 (emphasizing Congress' intent to ensure a diversity of broadcast signals). With this general legislative framework in mind, we turn to the actions that gave rise to Hubbard Broadcasting's complaint.
 
 
 13
 Southern Satellite is licensed by the Federal Communications Commission (FCC) to provide services as a communications common carrier. At issue here is Southern Satellite's retransmission of WTBS, an Atlanta based television station owned and operated by Turner Broadcasting. WTBS is licensed by the FCC as a television broadcast station. Like other commercial television stations, Turner transmits the WTBS video signal to the viewing public free of charge and generates WTBS' income principally from advertising revenues. See Capital Cities Cable, Inc., 104 S.Ct. at 2701.
 
 
 14
 In December of 1976, after receiving FCC approval, Southern Satellite began to retransmit the WTBS signal to cable systems around the nation. At that time, Southern Satellite received the WTBS signal over the air by means of a UHF receiving antenna. After reception by Southern, the WTBS signal was retransmitted in its entirety and without modification to a satellite transponder leased by Southern from RCA. From there the WTBS signal was relayed by the satellite back to receiving antennae on earth. These antennae are normally owned by cable systems. After reception by a cable system, the WTBS signal was relayed to the system's headend and from this point was distributed by wire to individual cable subscribers.
 
 
 15
 Between 1976 and April of 1979, the WTBS video signal retransmitted by Southern Satellite was broadcast by WTBS over the air (UHF signal). The UHF signal was the only video signal generated by WTBS at that time. During that period, Southern received various complaints concerning the overall quality of the WTBS picture. In response, Southern Satellite began to explore the possibility of receiving the WTBS signal by means of a direct microwave connection between WTBS and Southern Satellite. If such a connection could be established, both the quality and the reliability of the WTBS picture would be improved.
 
 
 16
 Turner, for separate and distinct business reasons, was also interested in developing a direct microwave connection with Southern Satellite. The establishment of such a connection would enable Turner to generate two video signals: one signal that would be transmitted over the air to the Atlanta area and a second signal that would be transmitted directly to Southern Satellite by microwave connection. Both of the WTBS signals would be generated simultaneously and would be identical with respect to all programming material and with respect to most nonprogramming material (approximately 60 percent). However, rather than transmit local Atlanta area advertising on both signals, local advertising made available to the Atlanta audience on the UHF signal would be substituted with national advertising on the microwave signal. This technical process would allow Turner to take full economic advantage of WTBS' nationwide exposure while at the same time and at lower rates still provide local advertising to the Atlanta area.
 
 
 17
 Turner had significant economic incentive to take advantage of the nationwide exposure resulting from Southern's retransmission of WTBS. Although Southern's retransmission of WTBS made that signal available to cable systems and their subscribers nationwide, Turner itself received no licensing fees or other payments from either Southern Satellite or the cable systems that received WTBS. In fact, even if Turner had wished to do so, it could not legally have prevented or controlled the retransmission of WTBS by Southern Satellite or any other communications carrier. Thus, because Turner could not prevent nationwide distribution of its signal, it understandably sought to take economic advantage of that distribution.
 
 
 18
 In October of 1978, Southern Satellite applied to the FCC for permission to develop the microwave facilities necessary to create a direct microwave connection between itself and WTBS. Turner, of course, consented to the establishment of this direct connection. Southern Satellite received permission from the FCC in March of 1979. By mid-April, in addition to receiving the WTBS UHF signal, Southern Satellite began receiving a second WTBS signal by direct microwave connection. In July, Southern Satellite notified the FCC that it was receiving the WTBS signal by direct microwave connection.
 
 
 19
 Since April of 1979, WTBS has transmitted two signals, both of which are received by Southern. One signal is transmitted over the air. The other is transmitted by direct microwave connection.
 
 
 20
 The UHF signal created by WTBS is first transmitted to a UHF transmitter owned by Turner. From there, the signal is transmitted over the air to the local Atlanta market. The WTBS UHF signal is received by Southern over the air on its own UHF antenna. The WTBS microwave signal is transmitted to a microwave transmission antenna that is located on a WTBS tower. The microwave transmitter and the transmission antenna are owned and maintained by Southern Satellite. After transmission from this antenna, the microwave signal is received by Southern Satellite's microwave receiver antenna.
 
 
 21
 Upon receipt by Southern Satellite, both WTBS signals are sent through a device known as a lenco video presence detector (presence detector). The presence detector is owned by Southern and is programmed to select automatically and without comparison one of the two incoming WTBS signals. In this case, the presence detector automatically and at all times selects the WTBS microwave signal unless that signal is interrupted or is substantially degraded in quality. If this should occur, the presence detector, again automatically, shifts to the UHF signal. This shift assures that Southern's retransmission of WTBS to subscribing cable systems will not be interrupted. Regardless of which WTBS signal emerges from the presence detector, it is then retransmitted by Southern Satellite in its entirety and without editing or modification.
 
 
 22
 In addition to shifting automatically if the microwave signal is impaired, a switch does exist that can be used to shift the presence detector from one signal to the other if necessary. This switch is owned and operated by Turner and is located in the WTBS studio. Southern has no interest in and no control over the use of this switch.
 
 
 23
 Today, Southern Satellite's retransmission of WTBS is received by several thousand cable television systems throughout the country. As a result, the copyrighted programming embodied in the WTBS signal is available to approximately 30,000,000 cable subscribers. Cable systems receiving the WTBS signal pay Southern Satellite a fee for its services. These cable systems are also subject to the compulsory licensing program and pay a percentage of their gross receipts into the Register of Copyrights for the right to show the copyrighted works contained in the WTBS signal. Southern Satellite pays no copyright fees to Turner, to the Copyright Royalty Tribunal, or to the creators of the copyrighted programming.
 
 
 24
 Hubbard Broadcasting operates local television stations in three markets reached by the WTBS signal (Minneapolis-St. Paul, Minnesota; Albuquerque, New Mexico; and St. Petersburg, Florida). Hubbard, like WTBS, subsists almost entirely from money generated by the sale of advertising. Also like WTBS, Hubbard pays licensing fees to copyright owners for the right to show much of the programming made available by its stations. Several programs licensed by Hubbard were also licensed by Turner, and as a consequence of Southern's retransmission of WTBS, on several occasions, programs shown by Hubbard also appeared as part of the WTBS signal available to cable subscribers in Hubbard's markets. It is this overlapping programming which initially gave rise to the present action.
 
 
 25
 In this action, Hubbard raises several claims. Each claim generally involves the interpretation and application of section 111 of the Copyright Act. The district court rejected Hubbard's contentions and on a largely stipulated record granted Southern's/Turner's motion for summary judgment. Hubbard, 593 F.Supp. at 823. After our own plenary consideration of the legal issues here involved, see Eastern Microwave, Inc., 691 F.2d at 127, we conclude the district court correctly rejected Hubbard's claims, and thus we affirm the dismissal of Hubbard's complaint.
 
 
 26
 On appeal, Hubbard, with the exception of one issue, raises the same contentions rejected by the district court. First, Hubbard argues that the provisions of section 111(b) of the Copyright Act, 17 U.S.C. Sec. 111(b), place Southern's activities outside the scope of the compulsory licensing program in general and specifically outside the scope of the carrier exemption. Second, Hubbard asserts that regardless of whether section 111(b) is applicable to this action, Southern's actions are inconsistent with the requirements of and thus Southern cannot qualify for the carrier exemption. Third, Hubbard contends that the purpose and policy underlying the compulsory licensing provisions of section 111 do not support a compulsory license for cable stations carrying the WTBS signal and in fact implicitly prohibit Turner's commercial substitution process. Finally, Hubbard argues that by implication the district court found Turner directly liable for copyright infringement.
 
 
 27
 In addressing the issues presented, we must constantly bear in mind the underlying goals of the Copyright Act, see ante at 397. This is particularly true here because the issues presented arise in large part from the use of technology perfected after the enactment of the Copyright Act. In such a situation, we " 'look to the 'common sense' of the statute ..., to its purpose, [and] to the practical consequences of the suggested interpretations ... for what light each inquiry might shed.' " Eastern Microwave, Inc., 691 F.2d at 127 (quoting New York State Commission on Cable Television v. Federal Communications Commission, 571 F.2d 95, 98 (2d Cir.), cert. denied, 439 U.S. 820, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978) ). As the Supreme Court recently stated: "When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of [its] basic purpose [, which is to stimulate artistic creativity for the general public good]." Sony Corp. of America v. Universal City Studios, 464 U.S. 417, 104 S.Ct. 774, 783-84, 78 L.Ed.2d 574 (1984) (quoting Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156, 95 S.Ct. 2040, 2043-44, 45 L.Ed.2d 84 (1975) (footnote omitted) ). With this background in mind, we move to the specific contentions raised by Hubbard.
 
 Applicability of Section 111(b)
 
 28
 As an initial argument, Hubbard contends that the carrier exemption of section 111(a)(3) and the compulsory licensing provisions of section 111(c)(1) are inapplicable in this case due to the operation of section 111(b). This section provides that
 
 
 29
 [n]otwithstanding the provisions of subsections (a) and (c), the secondary transmission to the public of a primary transmission embodying a performance or display of a work is actionable as an act of infringement * * * if the primary transmission is not made for reception by the public at large but is controlled and limited to reception by particular members of the public * * *.
 
 
 30
 17 U.S.C. Sec. 111(b). At issue here is whether the WTBS microwave signal "is not made for reception by the public at large but is controlled and limited to reception by particular members of the public * * *." Id.
 
 
 31
 Hubbard, in urging the applicability of this section, focuses largely on the method by which the WTBS microwave signal is transmitted. Hubbard argues that because the microwave signal is not transmitted over the air like the UHF signal but rather is transmitted directly to Southern, the microwave transmission by its very nature is not "made for reception by the public at large." Id. In so doing, we believe Hubbard misperceives the focus and purpose of section 111(b).
 
 
 32
 In our view, section 111(b) is not intended to regulate the method of transmission but rather is intended to apply in those situations in which the primary transmitter itself seeks to limit the reception of its signal to "particular members of the public." Id. Examples of situations in which section 111(b) would be applicable include among others, closed circuit television, pay television, and pay cable. See H.R.Rep. No. 1476, 94th Cong., 2d Sess. 92, reprinted in 1976 U.S.Code Cong. & Ad.News at 5707. Central to each of these examples is the primary transmitter's specific intent and actual attempt to narrow the reception of its signal to an identifiable and distinct segment of the general public who generally will either subscribe to or purchase the service provided. Thus, if a secondary transmitter picks up this type of "controlled" signal, section 111(b) protects the primary transmitter and provides it with a remedy against the secondary transmitter even though the secondary transmitter might otherwise fit within the carrier exemption of section 111(a)(3) or the compulsory licensing provision of section 111(c)(1).
 
 
 33
 Here, Turner's microwave signal, although not available over the air, is in no way controlled or limited by Turner to specific, identifiable recipients. In fact, Turner has no desire to limit the eventual reception of its signal and intends the signal to be available to the general public as a whole. This intent is largely evidenced by the fact that Turner's simultaneously generated UHF signal, which is available over the air and which Hubbard concedes is neither "controlled" nor "limited," contains without exception the identical copyrighted programming material as the WTBS microwave signal. Further, unlike other subscription services, Turner receives no payments either from Southern or from the individual cable television systems. As has always been true, Turner's microwave signal like its UHF signal is transmitted free of charge with Turner deriving its income primarily from the sale of advertising. We reject the applicability of section 111(b) in the present action.
 
 
 34
 In a related technologically based argument, Hubbard contends that the WTBS microwave signal (retransmitted by Southern and the cable systems) is not protected by the compulsory licensing provisions of section 111 since in its view these provisions are applicable only in situations in which the secondarily transmitted television signal is initially broadcast over the air. In advancing this argument, Hubbard forgets that "[i]nterpretation of the [Copyright] Act must occur in the real world of telecommunications, not in a vacuum." Eastern Microwave, Inc., 691 F.2d at 132. Hubbard's view, if accepted, would largely freeze for section 111 purposes both technological development and implementation. And, by consequence, it would force both primary and secondary transmitters alike to forego available, economically feasible technology. We reject this stand still status quo oriented view of the compulsory licensing provisions.
 
 
 35
 Sections 111(c) and 111(d) of the Copyright Act provide for the general applicability of the compulsory licensing systems, 17 U.S.C. Sec. 111(c)(1), subject to certain exceptions, id. Sec. 111(c)(2)-(4), and compliance requirements, id. Sec. 111(d)(1)-(2). At issue in this instance is the general applicability of the compulsory licensing system. The specific exceptions and compliance requirements are not involved.
 
 
 36
 The general compulsory licensing provision provides that
 
 
 37
 secondary transmissions to the public by a cable system of a primary transmission made by a broadcast station licensed by the Federal Communications Commission * * * shall be subject to compulsory licensing * * *.
 
 
 38
 Id. Sec. 111(c)(1). Here, it is undisputed that WTBS is a "broadcast station licensed by the [FCC]." Id. Further, if the microwave signal is a "primary transmission," there is no question that its retransmission by cable systems is a "secondary transmission to the public." Id.; see also id. Sec. 111(f) (defining "secondary transmission" in terms of the "further transmitting of a primary transmission"); id. Sec. 101 (defining "publicly" in terms of transmitting copyrighted works "to the public"). Rather, the issue in this case is whether the WTBS microwave signal constitutes a "primary transmission."The Copyright Act defines a primary transmission as a "transmission made to the public * * * [that is] further transmitted by the secondary transmission service * * *." Id. Sec. 111(f). The resulting question then becomes whether the WTBS microwave signal is a "transmission made to the public." While the term "transmission" is not itself defined in the Copyright Act, the term "transmit" is defined. Id. Sec. 101. And, with respect to this definition, Congress has expressly stated that
 
 
 39
 [t]he definition of "transmit"--to communicate a performance or display "by any device or process whereby images or sound[s] are received beyond the place from which they are sent"--is broad enough to include all conceivable forms and combinations of wired or wireless communications media, including but by no means limited to radio and television broadcasting as we know them. Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a "transmission," and if the transmission reaches the public in any form, [that transmission constitutes a public performance or display] within the scope of clauses (4) or (5) of section 106.
 
 
 40
 H.R.Rep. No. 1476, 94th Cong., 2d Sess. 64, reprinted in 1976 U.S.Code Cong. & Ad.News at 5678 (quoting 17 U.S.C. Sec. 101) (emphasis added). Further, Congress specifically anticipated the transmission of other than over the air signals when it defined the term "cable system" (the very entity subject to the compulsory licensing provisions) as a "facility * * * that * * * receives signals transmitted or programs broadcast by * * * television broadcast stations * * * and makes secondary transmissions of such signals or programs * * * to subscribing members of the public * * *." 17 U.S.C. Sec. 111(f) (emphasis added).
 
 
 41
 These and other congressional statements, see, e.g., H.R.Rep. No. 1476, 94th Cong., 2d Sess. 62-65, reprinted in 1976 U.S.Code Cong. & Ad.News at 5676-78, convince us that the WTBS microwave signal, like its UHF signal, constitutes a "transmission made to the public," 17 U.S.C. Sec. 111(f), as intended by Congress. Thus, stated differently, the WTBS microwave signal constitutes a "primary transmission." Consequently, the compulsory licensing system is generally applicable to the WTBS microwave signal and the fact that this signal is not broadcast over the air is of no consequence.
 
 
 42
 Availability of the Section 111(a)(3) Carrier Exemption
 
 
 43
 We next address the issue of whether Southern qualifies for the carrier exemption of section 111, 17 U.S.C. Sec. 111(a)(3). To qualify for the exemption, five elements must be established:
 
 
 44
 1. There must be a "secondary transmission of a primary transmission";
 
 
 45
 2. made by a "carrier";
 
 
 46
 3. that has no "direct or indirect control over the content or selection of the primary transmission";
 
 
 47
 4. that has no "direct or indirect control over the * * * particular recipients of the secondary transmission"; and
 
 
 48
 5. "whose activities with respect to the secondary transmission consist solely of providing wires, cables, or other communications channels for the use of others."
 
 
 49
 Id. If any of these five elements is not present, Southern is not exempt and will be liable for the unauthorized public performance of copyrighted material. The district court properly identified these five elements, Hubbard, 593 F.Supp. at 816. Upon analysis the district court also concluded that Southern met each of the five elements of the carrier exemption and thus was protected by the carrier exemption, id. at 816-21.
 
 
 50
 Given our prior discussion concerning the nature of the WTBS microwave signal, it is clear that Southern's retransmission of the WTBS microwave signal constitutes the "secondary transmission of a primary transmission." 17 U.S.C. Sec. 111(a)(3). Thus, the first element of the carrier exemption has been established. Further, with respect to elements two, four, and five of the carrier exemption, we conclude the district court properly addressed these elements and adopt the well reasoned district court opinion to that extent. Hubbard, 593 F.Supp. at 817-18, 820-21; see also Eastern Microwave, Inc., 691 F.2d at 129-32.
 
 
 51
 We turn then to the third element of the carrier exemption which requires Southern to exert no "direct or indirect control over the content or selection of the primary transmission." Id. We look first to the "content" component of this third element.
 
 
 52
 Other than some inconsequentially minor programming suggestions, it is essentially undisputed that Southern does not directly control either the programming or nonprogramming content of the WTBS signal. Rather, the focus of Hubbard's complaint is on the active cooperation between Southern and Turner which Hubbard contends evidences Southern's indirect control over the "content" of the WTBS signal. Specifically, Hubbard argues that the establishment of a microwave link and the consistent retransmission of the WTBS microwave signal enables Turner to substitute commercials and constitutes the indirect control of content by Southern. We disagree.
 
 
 53
 The microwave link established between Southern and WTBS certainly facilitates Turner's commercial substitution process. However, from the perspective of Southern, the motivating force behind the establishment of the microwave link was its desire to provide its customers with a better quality, more reliable WTBS signal. This legitimate business interest on the part of Southern is entirely consistent with the goal of the Copyright Act of making broadly available and allowing the public to benefit from the copyrighted works carried on television signals. See Capital Cities Cables, Inc., 104 S.Ct. at 2706; see also Sony Corp. of America, 104 S.Ct. at 783. The FCC itself approved the establishment of the direct microwave connection between Southern and WTBS.
 
 
 54
 Additionally, it is clear from the record that Southern exercises no control over the selection and broadcast of the particular programming or nonprogramming material transmitted by WTBS. These decisions are made entirely by Turner. And, to the extent that commercial substitution does occur, Turner again is entirely responsible for deciding what will be substituted and for making the actual substitution. Finally, upon receipt of the WTBS signal, Southern retransmits that signal in its entirety with no deletion or modification. We believe Southern exercises neither direct or indirect control over the content of the WTBS signal.
 
 
 55
 We conclude further that Southern Satellite does not impermissibly control the "selection" of the primary transmission. See 17 U.S.C. Sec. 111(a)(3). Initially, to the extent Southern chooses to retransmit the WTBS signal rather than the signal of another broadcast station, this case is indistinguishable from the Second Circuit's decision in Eastern Microwave, Inc., 691 F.2d 125. In that case, the court concluded that
 
 
 56
 Technical restrictions which forced EMI to make an initial, one-time determination to retransmit the signals of a particular station, whatever the content of those signals, do not evidence the "control over the * * * selection of the primary transmission" intended to be precluded under Section 111(a)(3).
 
 
 57
 Id. at 130. We agree with and adopt the Second Circuit's reasoning on this narrow issue.
 
 
 58
 Hubbard contends, however, that Eastern Microwave, Inc. is distinguishable from this case because Southern, in addition to making the initial choice to retransmit WTBS, makes a further choice by then selecting for retransmission the microwave signal rather than the UHF signal. It is this second selection that Hubbard asserts removes Southern from the protection of the carrier exemption.
 
 
 59
 In developing its position, Hubbard necessarily focuses on the operation of the presence detector. As previously noted, once received by Southern, both the microwave signal and the UHF signal are sent through the presence detector. The presence detector, however, makes no comparison of the two signals but rather automatically and at all times selects the microwave signal. Only if the microwave signal is interrupted or becomes undetectable does the presence detector, again automatically, select the UHF signal. The technological ability to shift to the UHF signal if necessary prevents disruption of Southern's retransmission and helps insure that the viewing public will at all times receive WTBS programming.
 
 
 60
 Further, as Hubbard now concedes, "WTBS [rather than Southern] owns and operates the switch that can interrupt and stop the transmission of the microwave signal, causing the * * * presence detector to choose the UHF signal." Hubbard, 593 F.Supp. at 819. Finally, with respect to the WTBS signal emerging from the presence detector, as previously stated, it is clear that Southern then retransmits without deletion or modification exactly what and all of what it receives.
 
 
 61
 We conclude no impermissible selection occurs under the facts of this case. Here, the decision to create a direct microwave link and employ a presence detector has enabled Southern to provide a better quality, more dependable television signal to the viewing public. Once set, Southern exercises no control over the operation of the presence detector. The presence detector is self-regulating.
 
 
 62
 At bottom, with respect to both the "content" and the "selection" issues, Hubbard contends that to remain exempt, Southern must purposely forego available and affordable technology that, in addition to being economically beneficial, enables Southern to provide a better quality product to its customers. While this technology may facilitate Turner's commercial substitution process, this facilitation, in and of itself, is insufficient to disqualify Southern from the carrier exemption. We believe Southern Satellite does not impermissibly control the content or selection of the secondary transmission of the WTBS signal.
 
 
 63
 This conclusion, coupled with our adoption of the district court's analysis, places Southern within the scope of the carrier exemption. Thus, section 111(a)(3) provides Hubbard with no basis for establishing copyright liability on the part of Southern Satellite.
 
 
 64
 Turner's Commercial Substitution and the Compulsory Licensing Program
 
 
 65
 As a third theory of liability, Hubbard asserts that the commercial substitution process undertaken by Turner and facilitated by Southern impermissibly alters the careful balance achieved by Congress through the compulsory licensing system. Specifically, Hubbard focuses on section 111(c)(3) which provides that the compulsory license will not be applicable if
 
 
 66
 the content of the particular program * * * or any commercial advertising * * * transmitted by the primary transmitter * * * is in any way willfully altered by the cable system * * *.
 
 
 67
 17 U.S.C. Sec. 111(c)(3). Here, Hubbard argues that Turner, by substituting commercials at the primary transmission stage, accomplishes indirectly what Congress has concluded cable systems cannot do directly. As a result, Hubbard contends that cable systems carrying WTBS cannot qualify for the compulsory license of section 111(c)(1) with respect to the WTBS transmission. We disagree.
 
 
 68
 In adopting section 111(c)(3), Congress concluded that to allow cable television systems to alter the primary transmission by substituting commercials would
 
 
 69
 significantly alter[ ] the basic nature of the cable retransmission service, and make[ ] its function similar to that of a broadcaster. Further, the placement of substitute advertising in a program by a cable system on a "local" signal harms the advertiser and, in turn, the copyright owner, whose compensation for the work is directly related to the size of the audience that the advertiser's message is calculated to reach. On a "distant" signal, the placement of substitute advertising harms the local broadcaster in the distant market because the cable system is then competing for local broadcasting dollars without having comparable programming costs.
 
 
 70
 H.R.Rep. No. 1476, 94th Cong., 2d Sess. at 93-94, reprinted in 1976 U.S.Code Cong. & Ad.News at 5708. Consequently, Congress "attempted broadly to proscribe the availability of the compulsory license if a cable system substitutes commercial messages." Id. at 94, reprinted in 1976 U.S.Code Cong. & Ad.News at 5708.
 
 
 71
 Congress, in forbidding commercial substitution by cable systems, sought to ensure the competitive compatibility of the cable system and the local broadcaster. Cable systems, when retransmitting local signals, would retransmit exactly what was received and in so doing would neither undercut the local broadcaster's ability to generate local advertising revenues nor jeopardize the ability of creators of programming to receive a fair return for their product based upon the size of the audience that the advertiser's message was calculated to reach. Id. In other words, the status quo relationship between local broadcasters and copyright holders would be protected and facilitated. With respect to distant signal retransmission, Congress sought to ensure that cable systems were not allowed, while claiming protection of the compulsory license, to compete for local advertising dollars without having to bear comparable programming costs. Id.
 
 
 72
 As an initial matter, we emphasize that there has been no assertion on the part of Hubbard that either Southern or any cable system carrying the WTBS signal has ever substituted or in fact has ever attempted to substitute commercials originally placed on the WTBS signal by Turner. Rather, both Southern and the cable systems retransmit intact any commercials they receive from Turner on the WTBS signal. Thus, under the literal language of section 111(c)(3), no infringement based upon commercial substitution has occurred.
 
 
 73
 Additionally, we conclude that none of the concerns raised by Congress in adopting section 111(c)(3) are implicated by Turner's practices. WTBS, in placing only national advertising on the microwave signal, seeks to and in fact can economically address only the national advertising market. Turner cannot effectively address the local advertising markets served by Hubbard. Thus, Turner does not compete with Hubbard for local advertising dollars.
 
 
 74
 Further, to the extent Turner and Hubbard compete for national advertising dollars, that competition will exist regardless of Turner's current practices since even absent the microwave signal, Turner's UHF signal will continue to reach a national market and carry national advertising. And, unlike a cable system that substitutes commercials without bearing programming costs, Turner has the same types of programming costs as Hubbard.
 
 
 75
 Finally, we also conclude that Turner's development of two separate WTBS signals has no adverse impact on the interests of the copyright holders. These individuals or companies, when contracting with Turner, know that WTBS signals will be available nationwide as well as locally and are entirely free to take those steps necessary to assure that they are compensated accordingly. At bottom, no copyright holder is deceived by the extent of Turner's market or the commercial content of the signals; no advertiser reaches a smaller market than anticipated; and no local broadcaster is forced to compete with Turner on any greater level than would exist absent Turner's transmission of two television signals.
 
 Turner's Direct Liability
 
 76
 As a final matter, we decline to consider Hubbard's contention that the district court by implication found Turner directly liable for copyright infringement. The district court did not specifically address this issue, and a careful review of the district court record reveals that this theory of liability was not asserted in the district court. Because no issue of Turner's direct liability was presented below, it is not now properly before this court, and we will not consider it for the first time on appeal. Kriegesmann v. Barry-Wehmiller Co., 739 F.2d 357, 358 (8th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984).
 
 Conclusion
 
 77
 We believe section 111 contains no provision under which Southern Satellite or Turner is liable for copyright infringement. First, section 111(b) is inapplicable to this situation. Further, Southern Satellite falls within the carrier exemption of section 111(a)(3). Finally, we conclude that the policies underlying the Copyright Act, including compensating copyright holders fairly for the retransmission of their programs, are not adversely affected by Turner's commercial substitution process.
 
 
 78
 We affirm the district court's dismissal of Hubbard's action.